[PRIZE. INSTANCE COURT. SLAVE TRADE.]

## The ANTELOPE. The Vice-Consuls of Spain and Portugal, *Libellants.*.

The African slave trade is contrary to the law of nature, but is not prohibited by the positive law of nations.

Although the slave trade is now prohibited by the laws of most civilized nations, it may still be lawfully carried on by the subjects of those nations who have not prohibited it by municipal acts or treaties.

The slave trade is not piracy, unless made so by the treaties or statutes of the nation to whom the party belongs.

The right of visitation and search does not exist in time of peace. A vessel engaged in the slave trade, even if prohibited by the laws of the country to which it belongs, cannot, for that cause alone, be seized on the high seas, and brought in for adjudication, in time of peace, in the Courts of another country. But if the laws of that other country be violated, or the proceeding be authorized by treaty, the act of capture is not in that case unlawful.

It seems, that in case of such a seizure, possession of Africans is not **1825.** a sufficient evidence of property, and that the *onus probandi* is thrown upon the claimant, to show that the possession was lawfully **The Antelope.** acquired.

Africans who are first captured by a belligerent privateer, fitted out in violation of our neutrality, or by a pirate, and then recaptured and brought into the ports of the United States, under a reasonable suspicion that a violation of the Slave Trade Acts was intended, are not to be restored without full proof of the proprietary interest; for in such a case the capture is lawful.

And whether, in such a case, restitution ought to be decreed at all, was a question on which the Court was equally divided.

Where the Court is equally divided, the decree of the Court below is of course affirmed, so far as the point of division goes.

Although a consul may claim for *subjects unknown* of his nation, yet restitution cannot be decreed without specific proof of the individual proprietary interest.

APPEAL from the Circuit Court of Georgia.

These cases were allegations filed by the Vice-Consuls of Spain and Portugal, claiming certain Africans as the property of subjects of their nation. The material facts were as follows: A privateer, called the Colombia, sailing under a Venezuelean commission, entered the port of Baltimore in the year 1819; clandestinely shipped a crew of thirty or forty men; proceeded to sea, and hoisted the Artegan flag, assuming the name of the Arraganta, and prosecuted a voyage along the coast of Africa; her officers and the greater part of her crew being citizens of the United States. Off the coast of Africa she captured an American vessel, from Bristol, in Rhode Island, from which she took twenty-five Africans; she captured several Portuguese vessels, from which she also took Africans; and she captured a Spanish vessel, called the Antelope, in which she

1825.

The Antelope.

also took a considerable number of Africans. The two vessels then sailed in company to the coast of Brazil, where the Arraganta was wrecked, and her master, Metcalf, and a great part of his crew, made prisoners; the rest of the crew, with the armament of the Arraganta, were transferred to the Antelope, which, thus armed, assumed the name of the General Ramirez, under the command of John Smith, a citizen of the United States; and on board this vessel were all the Africans, which had been captured by the privateer in the course of her voyage. This vessel, thus freighted, was found hovering near the coast of the United States, by the revenue cutter, Dallas, under the command of Captain Jackson, and finally brought into the port of Savannah for adjudication. The Africans, at the time of her capture, amounted to upwards of two hundred and eighty. On their arrival, the vessel, and the Africans, were libelled, and claimed by the Portuguese and Spanish Vice-Consuls reciprocally. They were also claimed by John Smith, as captured *jure belli*. They were claimed by the United States, as having been transported from foreign parts by American citizens, in contravention to the laws of the United States, and as entitled to their freedom by those laws, and by the law of nations. Captain Jackson, the master of the revenue cutter, filed an alternative claim for the bounty given by law, if the Africans should be adjudged to the United States; or to salvage, if the whole subject should be adjudged to the Portuguese and Spanish Consuls.

The Court dismissed the libel and claim of **1825.** John Smith. They dismissed the claim of the The Antelope. United States, except as to that portion of the Africans which had been taken from the American vessel. The residue was divided between the Spanish and Portuguese claimants.

No evidence was offered to show which of the Africans were taken from the American vessel, and which from the Spanish and Portuguese ; and the Court below decreed, that, as about one third of them died, the loss should be averaged among these three different classes ; and that sixteen should be designated, by lot, from the whole number, and delivered over to the Marshal, according to the law of the United States, as being the fair proportion of the twenty-five, proved to have been taken from an American vessel.

*Feb. 26th, 28th, and 29th.*

The *Attorney General*, for the appellants, stated, that the cases of the respective allegations of the Spanish and Portuguese Consuls, upon which distinct appeals had been taken, which had been separately docketed in this Court,[a] were so blended together, that it was thought most proper to bring on the hearing in both cases at the same time.

Mr. Chief Justice MARSHALL stated, that the appellants, in the argument of No. 12, might refer to the evidence in No. 13 ; they might invoke it into this cause, so far as it was necessary for their purpose, and the Court would take no-

a The Spanish case as No. 12, and the Portuguese as No. 13.

1825.

The Antelope.

tice of the facts which appeared in the other transcript ; but that the two causes must come on separately, and in their order. But it has been thought most expedient to report the two arguments together.

The reasons assigned in the appellants' case, for reversing the decrees of the Court below, were as follows :

1st. That the possession of these Africans by the claimants, before the capture by the privateer, affords no presumption that they were their property ; that they must show a law entitling them to hold them as property.

2. That if these Africans are to be considered as having been in a state of slavery, when in the Spanish and Portuguese vessels from which they were taken, and if the Court shall consider itself bound to restore them to the condition from which they were taken, this can be done only by placing them in the hands of those who shall prove themselves to have been the owners ; and that this purpose cannot be answered by restoring them to the Consuls of Spain and Portugal.

3. That if some of these Africans were the property of the claimants, yet some were not ; and failing to prove which were theirs, the decree is erroneous, in determining by lot, a matter which the claimants were bound to establish by proof.

Mr. *Key,* for the appellants, argued, that the facts of the case presented the question to be considered in a point of view, peculiarly favoura-

ble to the appellants. A piratical vessel was found hovering near our coast, apparently meditating a violation of our laws. It was brought, with the persons on board, into the custody of the Court, by an act of seizure, not only lawful, but meritorious towards the claimants, since it rescued what they claim as their property, from the grasp of pirates. If the claimants had not interposed, the course of the Court would have been obvious. The illegal and piratical capture by our citizens, gave *them* no rights; and even if it did, they instantly forfeited them under our laws, which they intended to violate. But the claimants demand restitution of the Africans found on board this vessel, alleging them to be their property, lawfully acquired on the coast of Africa, and piratically taken from them by the Arraganta. This demand is resisted by the government of the United States, upon the ground that the persons in question are not by our laws to be considered as slaves, but as freemen. These laws the Court must administer, and not the laws of Spain. Our national policy, perhaps our safety, requires, that there should be no increase of this species of population within our territory. The acts of Congress provide that, however brought here, they shall be set free, and sent back to their own native country. The Spanish and Portuguese claimants demand them as their property. We repel the claim, by asserting their right to liberty. The demand of restitution is inconsistent with our policy, as declared in our statutes and other

*1825.*

The Antelope.

**1825.** public acts.[a]   These declarations gave fair warn-

*The Antelope,* ing to those engaged in the slave trade, that though we did not intend to interfere with them on the high seas, yet, if their victims should come within the reach of our laws, we should protect them. These acts constitute a solemn pledge to all nations interested in the suppression of this inhuman traffic, and to Africa herself, that if the objects of it should seek our protection, where they may lawfully receive it, within our territorial jurisdiction, and at the feet of our tribunals of justice, they should be entitled to that protection. Therefore, admitting the facts as alleged by the claimants, what they claim as justice in a matter of property, cannot be done to them, without disregarding our own policy, endangering our own safety, infringing our own laws, and violating the plighted faith of the country.

But supposing they have a right to insist on restitution of their property, what proof ought to be required, and what proof do they give, of their proprietary interest ?   It is material, also, here to consider, that those human beings, who are claimed as property, come into the jurisdiction of the Court, not by any wrongful act of ours, but lawfully, providentially ; and are to be treated just as if they were thrown upon our shore by a storm.   The Spanish owners show, as proof of property, their previous possession ; and the possessor of goods, it is said, is to be presumed the lawful owner.   This is true as to *goods,* because they have universally and necessarily an

a  *Vide Appendix,* Note I. (A.)

owner. But these are *men*, of whom it can-
not be affirmed, tha they have universally and
necessarily an owne In some particular and
excepted cases, depending upon the local law
and usage, they may be the subjects of property
and ownership ; but by the law of nature all
men are free. The presumption that even black
men and Africans are slaves, is not a universal
presumption. It would be manifestly unjust, to
throw the *onus probandi* upon them to prove
their birthright. Whatever may have once been
the condition of Africa, and of the African slave
trade, the authentic information on this subject
will show, that it is now impossible to determine,
by the fact of possession, whether the party has
been lawfully acquired or not. There must be
an overwhelming probability of the lawfulness of
such acquisition, to raise such a presumption.
This is instanced by the different presumptions
allowed in different parts of our own country, in.
respect to this description of persons. In the
southern States, there is the highest degree of
probability, from universal practice and well
known law, that such persons are slaves. But
in the northern States, the probability is just
the contrary, and the presumption is reversed.
And in the present state of the slave trade,
Africans, in a slave ship on the high seas,
are in no such circumstances as to raise a
presumption that they are lawfully held in slave-
ry. For if there be a *permitted* slave trade,
there is also a *prohibited* slave trade ; and the
prohibition is much more extensive than the per-

mission. The claimants must, consequently, show something more than mere possession. They must show a law, making such persons property, and that they acquired them under such law. In order to maintain their title, they show the municipal law of Spain; but the operation of that law can only extend throughout the territory of Spain, and to Spanish vessels on the high seas. These persons are now within the jurisdiction of our conflicting law; and they are brought here without any violation of the sovereign rights of Spain. Our own law, which is in force here, must prevail over the law of Spain, which cannot have an extra-territorial operation. There is no reason of comity, or policy, or justice, which requires us to give effect to a foreign law conflicting with our own law on the same subject. Besides, the Spanish law is not only contrary to ours, but is inconsistent with the law of nature, which is a sufficient reason for maintaining the supremacy of our own code. If this municipal law of Spain were allowed to prevail against our law, in our own territory, and before our own Courts, the same effect must be given to the law of every other country, under the same circumstances. If, instead of these Africans, there had been taken by the same illegal capture, Spanish slaves, from an Algerine corsair, and afterwards brought in the same manner into our ports, they might, upon the same principle, be reclaimed by the representative of Algiers, who could easily show, that, by the law prevailing among the Barbary states, they were slaves.

The municipal law of Spain, then, is insuffi-

cient to maintain the title set up by the claim-
ants. They are driven to the necessity of in-
voking the aid of the law of nations, as sanction-
ing their asserted right to property in these hu-
man beings. But if the law of nations is silent
upon this subject; if it neither sanctions nor
forbids the traffic in African slaves; if it is mu-
nicipal law alone which determines in what man-
ner private property is acquired and lost, then
the claimants have no law to stand upon in as-
serting their claim. Supposing, however, this
idea not to be correct, it is incumbent on the
claimants to show, positively, that the slave trade,
as now practised, has the sanction of the law of
nations, as now understood by the civilized and
Christian nations of the world. That it once
had that sanction, may, perhaps, be admitted ;
but, it must also be admitted, that there was
once a time when it had not that sanction. The
permission began by general assent and usage.
The King of Spain, in the preamble to his edict
of 1817, admits that it was incorporated into the
code of nations as an exception to the general
principles on which that code is founded.ᵃ When
the practice was adopted by the *general,* not
*universal assent,* of civilized nations, it became
a part of the law of nations. In the same man-
ner, a *general,* and not a *universal,* denunciation
of the practice, is sufficient to make it cease to
be a part of the law of nations. In the great
moral and legal revolution which is now going
on in the world respecting this trade, the

ᵃ *Vide Appendix.* Note I (B.) p. 82.

time must come when it will cease to have a legal existence by the universal concurrence of nations. In the mean time, the question must be discussed, as it arises under various circumstances, until we reach the desired period, when the universal sentiment of the wise and the good shall become the rule of conduct sanctioned by authority capable of enforcing it. All the modifications and improvements in the modern law of nations have been gradually introduced. The writers upon that law explain the manner in which these changes have been made and sanctioned.[a] The documents to be laid before the Court will show the present state of the world's opinion and practice upon this subject, and will prove that the time is at hand, if it has not already arrived, when the slave trade is not only forbidden by the concurrent voice of most nations, but is denounced and punished as a crime of the deepest die. This is shown by the declarations contained in the treaties of Paris and Ghent; by the acts and conferences at the Congresses of Vienna, London, and Aix la Chapelle; by the treaties between Great Britain, and Spain, and Portugal; by the negotiations between the United States and Great Britain; and by the reports of the committees of the House of Commons, and the House of Representatives in Congress. We contend, then, that whatever was once the fact, this trade is now condemned by the general consent of nations, who have pub-

a *Vattel, Droit des Gens*, Chap. Prelim. § 25—27. 56. liv. 1. ch. 23. § 293. *Burlam.* 165. *Martens,* l. 9. § 5. l. 11. § 1.

licly and solemnly declared it to be unjust, inhuman, and illegal. We insist, that absolute unanimity on this subject is unnecessary ; that, as it was introduced, so it may be abolished, by general concurrence. This general concurrence may not authorize a Court of justice to pronounce it a crime against all nations, so as to make it the duty of all to seek out and punish offenders, as in the case of piracy. No decision has yet gone that length, nor is it necessary in this case to contend for such a principle. But in a case where the Africans are lawfully brought before a Court of the law of nations, and are claimed as property, by those who must be considered as *actors* in the cause, and who must, consequently, prove their title as alleged ; the fair abstract question arises, and their claim may well be repudiated as founded in injustice and illegality.

The learned counsel here commented upon the different cases in England and this country, with the view of reconciling them, and showing that they were all consistent with the principle he maintained. In the cases of the *Amedie,*[a] the *Fortuna,*[b] and the *Donna Marianna,*[c] the ship and persons on board were lawfully brought into the custody of the Court, either as being captured *jure belli,* or taken under circumstances which warranted a seizure as for a municipal offence. The claims were accordingly rejected, upon the ground of the unlawfulness of the trade. In the subsequent cases of the *Louis,*[d] and of *Madrazo*

a *Acton's Rep.* 240.  b. 1 *Dodson's Rep.* 81.  c *Id.* 91.
d 2 *Dodson's Rep.*

1825.   v. *Willes*,[a] the original seizure was held to be
The Antelope. unjustifiable, and consequently restitution was
decreed.   But none of the important principles
settled in the other cases, are overruled in these
cases, which turn exclusively upon the point, that
the wrong first done in the unlawful seizure must
be redressed.   In the case of *La Jeune Eugenie*,[b]
the claim of a French subject was rejected, as being
founded in a breach of the municipal law of his
own country, and the subject matter in contro-
versy was delivered up, with the consent of the
executive government of this country, to the sove-
reign of France, to be dealt with as he should
think fit.   All these latter cases show, that where
the Court has rightfully obtained possession of
human beings, who are claimed as slaves, it will
not restore them to their alleged proprietors, al-
though it may not go so far as to punish those who
are engaged in the trade, by the confiscation of
the vehicle in which it is carried on.

But another view may be taken of this sub-
ject.   The King of Spain, in his edict of 1817,
(before referred to,) informs us, that the slave
trade originated in motives of humanity, and was
intended to avoid the greater evils growing out of
the barbarous state of the African continent.
Suppose this to be a just representation, and that
the trade formerly consisted merely in the trans-
portation of persons who were slaves in Africa, to
be slaves elsewhere; it is at last discovered, by the

*a* 3 *Barnwell and Ald.* 353.   The several cases cited, will be
found in the Appendix to the present volume of these Reports, (G.)
p. 40—48.   *b* 2 *Mason's Rep.*

evidence taken before the British House of Com-    1825.
mons in .1790, by the investigations of the Afri-   ~~~~~
can Institution, and by the reports of the Bri-    The Antelope.
tish and American naval officers, to have entirely
changed its character.   Slaves are no longer ac-
quired merely by capture in war, or by trade ;
but free persons are seized and carried off by the
traders and their agents.   Wars are instigated
by them, for the mere purpose of making slaves.
The persons thus enslaved are clandestinely
brought away, under circumstances of extreme
cruelty, aggravated by the necessity of conceal-
ment, and smuggled into every country where
the cupidity of avarice creates a demand for
these unhappy victims.   May it not be asked, is
this trade ?  Is it lawful ?  Has it not so changed
its nature as to have become prohibited ?

Again : supposing the slave trade not yet to
have become generally illegal ; still it has be-
come so to the subjects of those countries who
have issued declarations against the trade.   To
such the *argumentum ad hominem* may be fairly
applied, as Sir W. Scott says in the *Louis.* Spain
and Portugal are among the countries who have
issued the most formal declarations against this
trade, although they have not yet taken the most
effectual measures to suppress it.   By the trea-
ties between these powers and Great Britain,
they have stipulated the entire abolition of the
slave trade north of the equator.   But their au-
thentic declarations pronounce it to be unlawful
and inhuman, wherever carried on ; and the per-
mission to continue it south of the line can only

affect them, and their subjects, and the powers with whom they have made such treaties. Their subjects cannot avail themselves of the permission, so far as other nations are concerned. Those nations have a right to look to the declarations as authentic evidence of the understanding of the Spanish and Portuguese governments, as to the law of nations.

But suppose they can avail themselves of the permission to trade in slaves within the limits prescribed by the treaties. The *onus probandi* is thrown upon them to bring themselves within those limits. This they have failed to do by satisfactory evidence.

And even if the law was in their favour, and they had shown the trade in which they were engaged to be within the limits permitted by the treaties, such a general claim could not be given in by the Consuls of Spain and Portugal for their fellow subjects. The Court has a right to the oath of the individual owners, as to their proprietary interest, and to explain the other circumstances of the case. As to the Portuguese claim, the owners are still unknown, and it is impossible that restitution can be made to the Consul, or even to his government, merely upon evidence that the Africans were taken from a vessel sailing under the Portuguese flag and papers, without any specific proof of the individual proprietary interest.

Lastly : if some of these Africans were the property of the claimants, some were not ; and, failing to identify their own, they are not entitled

to restitution of any as slaves, since among **1825.** them may be included some who are entitled to their freedom. The proof, by lot, which was substituted by the Court below for ordinary legal proof, is not satisfactory, especially where a claim to freedom conflicts with a claim to property.

The Antelope

Mr. *Berrien*, for the respondents, stated, that a reference to the transcript would show, that of all the parties to this cause in the Court below, the United States, and the Spanish and Portuguese Vice-Consuls, are alone before this Court; and that the United States, acquiescing in all the residue of the decree, have appealed from only so much as directs restitution to the Spanish and Portuguese Vice-Consuls.

The allowance of these claims is resisted on various grounds.

One prominent proposition pervades the whole of the opposite argument. Unless we can meet and resist it, we must submit to be its victims. It asserts, that the United States have acquired the possession of these negroes lawfully, without wrong; that with the possession so acquired, they have incurred the obligation to protect them; that all presumptions are in *favorem libertatis*; and, whatever the laws of other countries may tolerate or ordain, having ourselves declared the slave trade to be contrary to the principles of humanity and justice, we are bound, *prima facie*, to hold that there can be no property in a human being.

This proposition suggests the following inqui-
ries :

1. Was the possession lawfully acquired ?

2. If so, does the right which is asserted ne-
cessarily follow ?

3. With a view to their own peculiar condi-
tion, can the United States exercise such a
power ?

1. The lawfulness of the possession will be
determined by considering the capacity of the
seizing officer to make the seizure, in connexion
with the liability of the thing seized.

The seizure was made by John Jackson, com-
mander of the revenue cutter Dallas, belonging
to the District of Georgia ; and was made off the
coast of Florida, while that was yet a province
of Spain.   The right of Captain Jackson must
have resulted from the authority given by his
commission, and the laws of the United States.[a]

It did not result from the act of 1799, provi-
ding for the establishment of *revenue cutters ;*
for this only authorizes them to board vessels on
the coasts of their respective Districts, or within
four leagues thereof ; nor from the acts forbid-
ding the slave trade, for these are directed only
against vessels of the United States, or foreign
vessels intending to violate our laws by introducing
negroes into the United States.   The President
is, indeed, authorized to employ the armed ves-
sels of the United States, to cruise on the coasts
of the United States, or territories thereof, or of

a  The Louis, 2 *Dodson's Rep.* 238.

Africa, or elsewhere, and to instruct them to bring in all vessels found contravening those acts. But the laws of the United States can operate only on American vessels, on American citizens on board of foreign vessels, or on such vessels within the limits and jurisdiction of the United States. Besides, it is not pretended, that the revenue cutter Dallas had been selected as a cruising vessel under these acts, or that Captain Jackson had received any instructions from the President of the United States. Neither can the seizor derive any aid from the acts to preserve the neutral relations of the United States; for although the Courts of the United States will restore property taken in violation of these acts, when it is found within their jurisdiction, yet they do not authorize the cruisers of the United States to rove the ocean in search of objects on which that jurisdiction may be exercised.

So far, then, as it depends on the official character of the seizor, the act was lawless.

The thing seized was a Spanish vessel, in the possession of persons, some of whom were American citizens, who had captured it *jure belli*, under the flag of Artegas, or of Venezuela, and in a vessel which had been fitted out, or whose armament had been increased, in the United States.

The right to seize for a violation of the acts to preserve the neutral relations of the United States, has been already spoken of; but the adverse argument considers these captors as *pirates*, and asserts the right of every *individual* to war

against them as enemies of the human race. The answer is,

(1.) The seizure by Captain Jackson was not made on that ground. The libel alleges the seizure to have been made for a violation of the act of 1818, prohibiting the slave trade.

(2.) The Courts of the United States have declined to decide, that such an act would amount to piracy.

(3.) To put himself in a situation to make this seizure, Captain Jackson abandoned the duty enjoined upon him by his commission, and the laws of the United States, by leaving the limits intrusted to his vigilance. If he had lost his vessel, could he have justified himself before a Court Martial?

(4.) But if these men were pirates, and lawfully brought in, then the Spanish property was, from the moment of its introduction, under the protection of the ninth article of the treaty of San Lorenzo el Real.

Neither have the United States acquired any rights to enforce against these foreigners their own speculative notions on this subject, in consequence of their being *actors*. All parties are actors in a Court of admiralty, and these parties only became so after their property had been taken into the custody of the Marshal, and at the suit of the United States. But they were entitled, under the treaty, to have restitution of their property, without being put to other proof, than that it was found in their possession.

2. If the possession had been lawfully acqui-

red, could the Court refuse restitution on the ground suggested?

The great case on this subject, is that of the *Louis*;[a] our adversaries agree to refer the question to its decision.

It is a singular mistake, to suppose that *Sir W. Scott* directed restitution solely on the ground of the unlawfulness of the seizure; and thence to infer, that if the seizure had been lawful, he would have condemned. On the contrary, admitting the lawfulness of the seizure, he decides expressly that restitution must notwithstanding be awarded.

3. With a view to their own peculiar situation, could the United States maintain the doctrines contended for? It is said, that, having promulgated our policy in relation to this subject, we have thereby given a warning to slave traders, which they are bound to respect;—a *pledge* to the rest of the world which *we* are bound to redeem. But what is this policy, which we have thus notified to the world? It is to be found in our laws, inhibiting the slave trade. The penalties of these are denounced against our own vessels, and our own citizens, who shall engage in this traffic anywhere; and against foreigners and their vessels, who pursue it for the purpose of introducing negroes into the United States. There is no warning to the subjects of Spain and Portugal, quietly pursuing this traffic under the sanction of their own laws.

*a* 2 *Dodson's Rep.* 243. 249. 264.

The notion of the *pledge* is equally visionary. I find it difficult to form a conception of a pledge, which the party making it can at any time capriciously recall; and yet no one doubts that an act of the American Congress can, at at any moment, throw open the slave trade.

These considerations apart, would it become the United States to assume to themselves the character of *censors of the morals of the world* on this subject?—to realize the lofty conception of the adverse counsel, and consider themselves as the ministers of heaven, called to wipe out from among the nations the stain of this iniquity? Might not the foreign claimant thus rebuke them, in the strong language of truth? For more than thirty years you were slave *traders ;* you are still extensively slave *owners.* If the slave trade be robbery, you *were* robbers, and *are yet* clinging to your plunder. For more than twenty years this traffic was protected by your constitution, exempted from the whole force of your legislative power; its fruits yet lay at the foundation of that compact. The principle by which you continue to enjoy them, is protected by that constitution, forms a basis for your representatives, is infused into your laws, and mingles itself with all the sources of authority. Relieve yourselves from these absurdities, before you assume the right of sitting in judgment on the morality of other nations. But this you cannot do. Paradoxical as it may appear, they constitute the very bond of your union. The shield of your constitution protects them from your touch.

We have no pretence, then, to enforce against  1825.
others our own peculiar notions of morality.
The standard of morality, by which Courts of
The Antelope.
justice must be guided, is that which the law-pre-
scribes.

The learned counsel here proceeded to exa-
mine the evidence of proprietary interest, and in-
sisted that (besides the other testimony) the offi-
cial interposition of the Portuguese government
supplied the place of proof of individual interest,
and established the legality of the traffic.[b]

The objection to the decree of the Circuit
Court, on the ground that the distribution of
the negroes was directed to be made by lot, was
answered by the following considerations :

1. It appearing that the negroes found on
board the Antelope consisted of three distinct
parcels, taken from American, Spanish, and Por-
tuguese vessels, the obligation to protect the for-
mer, was equal to, and not greater than, that
which required the restoration of the latter. The
capture by Smith being considered, as in the
argument of our adversaries it is considered, as
*piratical,* the right of the Spanish claimant to
restoration under the treaty, was the *primary*
right, as founded on the treaty, which is the *su-*
*preme* law; and in the fair construction of that
treaty, it extended to every thing found on board
the Spanish vessel. Then the proof which should
diminish that right, was to be furnished by those
who sought to diminish it.

a  The Louis, 2 *Dodson's Rep.* 249.
b  The Bello Corrunes, 6 *Wheat. Rep.* 152.

2. It being. ascertained that these negroes were *property*, they were liable to distribution as other property ; and, notwithstanding the assertion to the contrary, the lot is often and legally resorted to, to separate undivided interests.

3. As between the Spanish and Portuguese claimants, no question on this point can arise here, because they have not appealed.

4. The United States cannot question this part of the decree, because they have not only not appealed from it, but have actually proceeded to enforce it *ex parte*, and have received restitution by lot of the negroes taken from the American vessel.

The United States have, then, derived no right to refuse restitution, from the manner in which they have acquired possession.

They are not entitled, by law, or the stipulations of treaty, to apply their speculative notions of morality to the subjects of Spain and Portugal.

They have ill-grounded pretensions in reference to this ill-fated subject, to set themselves up as the moral censors of the civilized world. Here is evidence of a proprietary interest to satisfy the mind beyond a reasonable doubt, and it is wholly uncontradicted ; and the passport of the King of Spain, and the interposition of the government of Portugal, show, if there be any necessity for it, the legality of the traffic, as to their respective subjects.

On what ground, then, is restitution refused ?

It is said, the slave trade is unlawful, contrary 1825.
to the principles of justice and humanity; and The Antelope.
that no right can be derived from so nefarious a
traffic.

Our inquiry is, by what law, which this Court
is competent to enforce, is it inhibited?

1. Is it contrary to the law of nations?

2. Is it contrary to the laws of the sovereigns
of the claimants; and can this Court refuse resti-
tution for that cause?

3. Is it contrary to the laws of the United
States; and can those laws be enforced against
these claimants?

1. What is the slave trade, considered as a sub-
ject on which the law of nations can operate.
Slavery exists, and has from all time existed, in
Africa, and in many other countries. Where it
exists, there will, of course, be an interior traffic
in slaves, which the law of nations cannot touch.
It is only on the transportation of negroes be-
tween two countries mutually tolerating slavery,
that this operation is contended for. But this
transportation is but an *incident* to the original
sin of slavery. If humanity nerves the arm of
the law, why is its force spent on the incident?
Why is it powerless in relation to the principal
wrong?

If the traffic in slaves be considered as in-
creasing the number of victims, by affording a
market for them, what is it then but an aggression
by the subjects of one nation on the rights of
another? If the nation forbids it, the offender
is punished by the municipal law; if the nation

1825.   permits it, she herself becomes the aggressor. In either case, how does it concern other nations?

The law of nations may be defined to be a collection of rules deduced from natural reason, as that is interpreted by those who adopt them, and resting in usage, or established by compact, for regulating the intercourse of nations with each other.

Rights and obligations are interior between sovereign and people, and are regulated by the municipal law; or exterior, between nations considered as moral persons; and these are regulated by the law of nations.

Now the slave trade is not contrary to the natural law of nations, because, until recently, it was universally tolerated and encouraged. It is not contrary to the positive law of nations; because there is no general compact inhibiting it; and nothing is more certain, than that the usage, or compact, even of a majority of nations, cannot produce rights or obligations among others. To what other evidences of the law of nations can we resort, except those of usage and compact; the former interpreting the rules of natural reason, the latter stipulating those of positive institution?

From this general view it would seem, that the slave trade is untouched by the law of nations. Let us render our inquiries more particular.

Is this traffic considered to be contrary to the law of nations, by the statesmen and jurists of Europe and America?

We are all aware of the conferences of the European powers on this subject, at Vienna, at Aix la Chapelle, and at London. But all the efforts of Great Britain to have it so denounced, were ineffectual. The marginal references point to the answers of the several powers respectively, and to the note and the answer of Lord *Castlereagh;* and all of them distinctly show, that the inhibiting of this traffic finds no place in the code of international law.[a]

The reports of various committees of Congress in the United States, also clearly prove, that, in the view of American statesmen, this traffic is not inhibited by the law of nations, since the object of them all is to devise means by which it may be so inhibited.[b]

After all, these conferences are only valuable as evidence of opinion, since they could not effect any change in the law of nations. On this subject the opinion of Sir *W. Scott* is distinctly expressed, in the case of the *Louis.*[c]

Among jurists, we find the judges of the K. B. in England, denying that the slave trade is contrary to the law of nations.[d]

And the same doctrine is announced by Sir *W. Scott*, after the most elaborate investigation, in the case of the *Louis* .

a 4th Report African Institution.   *Russia*, 20, 21.   *France*, 23, 24.   *Austria*, 26.   *Prussia, ib.*   Lord Castlereagh, 19, 20, 31, 32.

b *Vide Appendix* Note I. (A.) p. 1—32.

c 2 *Dodson's Rep.* 252, 253.

d Madrazo v. Willis, 3 *Barnwell and Ald.* 353.

e 2 *Dodson's Rep.* 210.

1825.        The only opposing cases are those of the *Ame-*
The Antelope. *die*[a] and *La Jeune Eugenie.*[b]

And, first, of the *Amedie.* It is most obvious, that this case has not been considered by the statesmen of Europe as establishing the doctrine contended for. The conferences to which we have just referred, look to a general compact among nations, as the only mode by which this traffic can be inhibited, and propose, by general suffrage, to declare it piracy, admitting, at the same time, that their views may be defeated by the refusal of any one state. But if the British ministry had so considered this case, they would most surely have availed themselves of it in these conferences. That it was not so viewed by Sir *W. Scott* is most certain; or, bound as his judicial conscience was by the decision of the Court of Appeals, he could not have pronounced the opinion given in the case of the *Louis.* The argument in the case of the *Amedie,* is founded entirely on the effect of the British act of parliament. Before the passing of that act, the learned Judge declares, that no Court in England could have pronounced the slave trade to be illegal; since, it is *prima facie* illegal every where, and on principles of universal law a claimant is not entitled to be heard in any Court. We inquire,

1. If, before the enactment of the British act of parliament, the slave trade was not forbidden, how that act could have changed the univer-

a 1 *Acton's Rep.* 240.            b 2 *Mason's Rep.* 409.

sal law ? It is said, that that act, *proprio vigore*, rendered it, *prima facie*, illegal every where, incapable abstractly of having a legal existence. Are these not mere caballistic terms, too occult for the apprehension of a legal mind ?

Consider the operation ascribed to this act of parliament. Jurisdiction, derived from *place*, is confined to the territory of the sovereign, from the *person*, to his own subjects ; but here is an act of the British parliament, which, according to Sir *Wm. Grant*, operates locally throughout all space, and personally over every individual in the various communities of nations. Sir *W. Scott* holds a doctrine directly opposite to this, in the case so often cited.<sup>a</sup> It did not arise from the locality of the tribunal, for it was solemnly held, in the case of the *Maria*,<sup>b</sup> (the Swedish convoy,) that this could not influence its decisions.

2. By what rule, other than that of *sic volo sic iubeo*, did the Master of the Rolls throw the burthen of proof on the claimants ? It is said, because the slave trade is illegal, contrary to justice and humanity, that human beings are not the subjects of property. The obvious answer is, this is a *petitio principii*. It assumes the very question in controversy. The case admits, and so the fact was, that up to the time when this act was passed, with the exception of America, this traffic was every where lawful ; *that property*

1825. The Antelope.

a *2 Dodson's Rep.* 239.   b *1 Rob. Rep.* 350.

*was acquired by it.* If at that time it had become otherwise, the change must have been effected by some positive act. The assertion that such an act existed, was an affirmative proposition. He who made it was bound to prove it. Such is the opinion of Sir *W. Scott,* and of Sir *J. M'Intosh,* Nay, in the case of. *La Jeune Eugenie,* it is admitted, that a prohibitory act of the country of which the claimant is a subject, must concur with the general law of nations, to authorize the forfeiture. Now, if the *onus* be on the claimant, it is certainly not necessary for the libellant to show a prohibitory act; all that in such case is essential is, that the claimant should fail to prove a permissive one. The opinion of Sir *W. Scott,* in relation to this case, will be found in *The Fortuna, The Diana,* and *The Louis.*[b]

3. How can even the rigid rule laid down by that Court be availed of? The Court expressly decline to decide what will be the effect of the proof, if made, declaring that a claimant, under such circumstances, is not entitled to be heard in any Court.[c] Of what avail, then, is the proof?

4. I find a difficulty in understanding what principles of the law of nations are not general in their operation, and yet the inhibition of the slave trade is said not to be one of the *general* principles of that law.

5. The argument seems to me to be self-de-

a *2 Dodson's Rep.* 242. 27 *Eng. Parl. Deb.* 253, 254.
b 1 *Dodson's Rep.* 85. 95. 2 *Dodson's Rep.* 210. 260.
c La Jeune Eug. 2 *Mason's Rep.* 409.

structive. It admits, that this novel principle
cannot be enforced against the subjects of those nations whose municipal regulations permit it. One of two things seems to follow. Either the slave trade is not contrary to the law of nations, or the municipal law may permit what the law of nations forbids. Can any single nation control the universal law? strike piracy from the law of nations? or deprive a belligerent of the rights of contraband, or of blockade? The learned Judge, in the case of *La Jeune Eugenie*, thus solves this difficulty. If a nation permits this traffic, the wrong is confined to the nation injured; and other nations are neither bound nor permitted to interfere. But the question recurs, what is the consequence, if a nation inhibit it? The offence must be against the power inhibiting, not, surely, against other nations, who, *ex concessis*, had no power either to inhibit, or to permit. On this point, also, we are fortified by the opinion of Sir *W. Scott*.[a]

The case of the *Amedie* may, then, we think, be considered as an experiment; a trial of the legal intelligence of Europe and America, and affords no safe guide for the decisions of this tribunal.

It is obvious to remark, that the case of *La Jeune Eugenie* is referred to by our adversaries under circumstances of some singularity. The principles advanced by the learned Judge, in delivering his opinion in that case, are maintained

[a] *2 Dodson's Rep.* 251.

by our opponents, while they revolt from the conclusion to which those principles conducted him. What we ask in this case, is precisely what was done in the case of *La Jeune Eugenie*, that the property should be restored to the consular agents of Spain and Portugal; and yet that very case is relied upon as an authority against this concession.

The proposition, that the slave trade is inconsistent with the law of nations, is maintained on the following, among other grounds, in the case of *La Jeune Eugenie :*

1. Its accumulated wrongs, and consequent inconsistency with that code.

" It is of this traffic, in the aggregate of its accumulated wrongs, that I would ask," (says the learned Judge,) " if it can be consistent with the law of nations ?"

To us, the inquiry seems to be vain and nugatory. The *gravamen* of the question is equally applicable to any other act of atrocity, and to any other code of laws. Murder, robbery, &c. &c. are attended with accumulated wrong. They, too, are inconsistent with the principles of justice and humanity, which lay at the foundation of international law. Do the laws which forbid these crimes, therefore, form part of that universal law? are they governed by it, or punished by it ?

2. Again it is said, the law of nations is deduced from the general principles of right and justice ; that whatever can be deduced from these principles as applicable to nations, and to the

nature of moral obligation, exists theoretically in the law of nations, and may be enforced.

It seems to us, that nothing is gained by the first of these propositions. The principles of right and justice, it is most certain, are capable of being applied equally, to the law of nations, and to the municipal law; to nations and to individuals. But the question here is, whether, in their application to the concerns of individuals, by the act of one or more nations, or of any number less than the whole, they do not rather constitute a part of the municipal law of the nations applying them, than of the general law of nations?

The second proposition appears to us to be too broad. Without doubt, it is the right and duty of every nation to prohibit crimes, and among others this crime. It is entirely consistent with moral obligation that they should do so. What then? Is the act of a single nation, fulfilling this duty, less simply municipal, because the morality of the act which it performs is of universal obligation, equally affecting all nations?

3. It is urged, moreover, that the slave trade is in violation of some of the first principles which ought to govern nations. The assertion is unquestionable. But may not the same thing be said of many acts, which are confessed y the objects of municipal regulations alone? *Smuggling* often begins in perjury. It is prosecuted in violation of the duty of the citizen. Its tendency is to corrupt the morals of the community. It sometimes eventuates in murder. Is an

1825. offence cognizable by the law of nations as an infraction of that law ?

The Antelope.

For these reasons, we submit to the Court, that restitution cannot be refused on the ground that the slave trade is contrary to the law of nations.

(2.) Is the traffic contrary to the laws of Spain and Portugal ; and can the Court enforce those laws by refusing restitution ?

1. The preceding argument, the decision in the *Louis,* and even that of *La Jeune Eugenie,* are referred to, to prove that, as to this point, the burthen of proof is on the appellants. They must show a prohibitory act.

2. If the burthen of proof be with us, we have furnished the evidence. The royal passport, and the order of the Portuguese government, are decisive on this point. The sanction of the colonial Governor was considered sufficient in the case of the *Diana.*[a]

3. The laws of Spai and Portugal are merely municipal, and, from the very nature of their provisions, incapable of enforcement by the Courts of the United States.[b]

4. Each sovereign has a right to the forfeiture, from the time of the commission of the act. He has the right of remission, and of pardon. Especially he has a right to decide, in his own tribunals, on the conduct of his own subjects, in relation to his own laws.[c] A monarch, or a na-

a 1 *Dodson's Rep.* 95.
b 4th *Report Afr. Inst. Abstract,* &c. 26.
c 2 *Dodson's Rep.* 256.

tion, stripped of these necessary attributes of 1825.
sovereignty, would cease to be sovereign. The The Antelope.
attempt by the United States to enforce these
laws would be a usurpation.

(3.) Can this Court apply the laws of the United States to this claim of foreign subjects?

1. The question has been answered in the preceding argument. The laws of the United States are strictly municipal, confined to citizens of the United States, to persons committing offences on board vessels of the United States, to foreigners seeking to introduce negroes into the United States. The claimants are not within these provisions.

2. Though the law of the United States has made this traffic piracy, it has not, therefore, made it an offence against the law of nations. The jurisdiction of the Circuit Court of the United States is exclusive for the punishment of this offence. Besides, no particular nation can increase or diminish the list of offences punishable by the law of nations.[a]

Such, in the opinion of the Judge of the High Court of Admiralty in England, is the only legitimate operation of the British act of parliament on this subject.[b] Such, in the opinion of Congress, is the necessary limitation of ours.[c]

*Mr. C. J. Ingersoll*, on the same side, insisted,

a *Rutherf.* 488. 491.

b 2 *Dodson's Rep.* 239.

c *Vide Appendix*, Note I. (A.)   Report of Committee of the House of Representatives, 1824, 1825.

that there was no evidence in the cause which sustained the allegation, that this vessel was found hovering on the coasts of the United States when she was seized; and if it were so, that would furnish no sufficient reason for refusing restitution to the Spanish and Portuguese claimants, who were unaffected by the misconduct of the piratical captors of their property.[a] Here the capturing vessel was illegally equipped in our ports, and the libellants have established their claim to the property in question under the laws of their own country. The original capture was not only made in violation of our neutrality, but was an act of piracy, and the duty of making restitution becomes imperative under the treaty with Spain. It appears from the treaties and edicts which have been referred to, that the slave trade was then tolerated by Spain and Portugal south of the equator; and, consequently, the presumption is, that Africans, obtained within the permitted limits, are legitimately held as slaves. This presumption is as strong as that which prevails in those States of the Union where slavery exists. None of the judicial decisions cited have gone the length of asserting, that the nations who have prohibited the slave trade can compel others to join in that prohibition. The case of the *Amedie* itself, as explained by Sir W. Scott in the *Diana*,[b] does not extend the principle by which the general prohibi-

a The Josefa Segunda, 5 *Wheat. Rep.* 338.
b 1 *Dodson's Rep.* 98, 99.

tion is to be enforced in the Courts of another country, to the case of claimants engaged in the trade permitted by the law of their own country.

Is, then, the slave trade contrary to the law of nations?

That law is a body of political ethics applied to nations. Not being reduced to a written code, we must seek for it in the elementary writings of publicists; in judicial precedents; and in general usage and practice.[a] Sir W. Scott adds to these ample sources the more limited and appropriate standard of ancient and admitted practice, not only by treaties, but by the laws, ordinances, and formal transactions of civilized States.[b] The great men who drew up the report upon the Silesia loan, declare the law of nations to be " founded on justice, equity, convenience, and the reason of the thing; and confirmed by long usage."

As to the judicial precedents, they neutralize each other, if, indeed, the authority of the original case of the *Amedie* be not entirely subverted by that of *Madrazo* v. *Willes*, and the admirable judgment of Sir W. Scott in the *Louis*. To the new conventional law which is now attempted to be established in the world, the United States have not yet become parties. We cannot enforce the treaties between other powers, by which the African slave trade is de-

a United States v. Smith, 5 *Wheat. Rep.* 160.
b Le Louis, 2 *Acton's Rep.* 249.

1825.
The Antelope.

nounced as contrary to humanity and justice, and is prohibited to their subjects. No jurist has been cited, from the earliest to the most recent, who has pronounced the trade contrary to the positive law of nations. So that the Court is left entirely to the light of reason in determining the question whether it be contrary to the law of nature, as properly applied to the conduct of nations and states.

If this prohibition be a part of the law of nations, it must be of the modern law of European nations. Are the United States parties to that law? And if they are, can they enforce its penal sanctions against other nations not parties to it?

Many principles have been at various periods asserted by confederacies of nations, which have ultimately failed to obtain a place in the general code of nations. The principles of the armed neutrality of 1780, were maintained by nearly all the powers of Europe against Great Britain alone; and yet her doctrines have not ceased to regulate the conduct of nations engaged in war. It is, at least, doubtful which is the true law of nations. The supposed inconsistency of the slave trade with the law of nature, will not alone condemn it in the view of a Court of justice, so as to authorize all nations to treat it as a crime, or to enforce its prohibition by the confiscation of the property of those engaged in it. It becomes all reflecting men to think seriously, and speak cautiously, on the subject of the illegality of a trade, which was once universally participated in by the civilized nations of Europe and America.

This fact is avowed by all the speakers on both sides of the abolition question, in the British par- liament. It is matter of notorious history, that both in ancient and modern Europe, the condition of slavery, and the commerce in slaves, were sanctioned by the universal practice, and law of nations. The very definition of slavery in the civil law, which has been copied by writers on public law, shows, that it was an institution established by positive law, against the law of nature: *Servitus est constitutio juris gentium, qua quis dominio alieno contra naturam subjicitur.*[b] The old common law writers are full of the subject of villeinage, which, it is well known, was not abolished in England until after the period when the African slave trade commenced. The offence of vagrancy was punished with slavery by the statute, 1 *Edw.* VI. c. 3.[c] The first case relating to the African slave trade, is that of *Butts* v. *Pen*, determined in the 29th of *Charles* II., being trover for negroes. The special verdict found, that they were usually bought and sold in India.[d] In a subsequent case, trover was brought for a negro in England. Holt, *C. J.* said, that *trespass* was the kind of action, but that *trover*

a *Hallam, Middle Ages*, vol. 4. p. 221. *Gibbon's Decline and Fall*, vol. 1. p. 63.

b *Domat, Loix Civ. Prel.* tit. 2. § 2. *Wood's Inst. Imp. and Civ. Law, Introd.* 93. *Grotius*, de J. B. ac P. C.2. c. 5. § 27. *Puffend.* b. 3. 2. § 8. 1 *Rutherf.* b. 1. c. 20. p. 474. *Bynk. Quæst. Jur. Pub.* l. 1. c. 3. p. 20. *Du Ponceau's Transl.*

c 4 *Reeve's Hist. Law*, 451.

d 2 *Keebl.* 785. 2 *Lev.* 201.

1825.  would lie, " if the sale was in Virginia."   Other cases turn upon questions as to the form of action, but they all concur in establishing the right to this species of property.  In 1689, all the Judges of England, with the eminent men who then filled the offices of Attorney and Solicitor General, concurred in opinion, that negroes were " merchandise," within the general terms of the Navigation Act.[b]  The famous case of *Somerset*, whilst it determined that negroes could not be held as slaves in England, recognised the existence of slavery in the colonies, as does the whole legal policy, both of that country and of France.[d]  The slave trade was long the subject of negotiations, treaties, and wars, between different European States, all of which consider it as a lawful commerce.   The very declarations in the recent European Congresses, and the negotiations between Great Britain and the United States, all show that the slave trade has not yet been prohibited by any thing like the unanimous consent of nations, so as to make it absolutely unlawful in the view of a Court of the law of nations.

The United States have done all in their power, consistently with their constitution, to abolish the trade.   But they have sought to abolish it by municipal means only.   They have prohibited it to their own citizens, not only by the or-

a 2 *Salk.* 666. 1 *Lord Raym.* 146. 5 *Mod. Rep.* 185. *Carth.* 596.

b 2 *Chalmers' Opinion of Eminent Lawyers*, 263.

c *Cobbett's State Trials*, vol. 20. p. 1.

d *Valin. Ord. de la Mar.* liv. 2. tit. 1. *du Capitaine*, art. 16.

dinary penal sanctions of revenue and trade laws ; 1825.
but they have made it a criminal offence, and pu- The Antelope.
nished it as piracy. No treaty has yet been ratified
with any foreign power, by which they engage to
co-operate with the United States in the prohibi-
tion ; and yet the Court is called on to anticipate,
by judicial legislation, the exercise of the treaty
making power, and to refuse restitution to the
subjects of Spain and Portugal, of that which they
claim as their property, under the laws of their
own country. This property has been brought
into our jurisdiction in consequence of its having
been taken from the possession of the original
owners, by armaments fitted out in our ports in
violation of our neutrality. The duty of resti-
tution is therefore plain, under the laws and trea-
ties of the Union, and the uniform decisions of
this Court.

The learned counsel also entered into a minute
and elaborate examination of the proofs of pro-
prietary interest, and reiterated many of the
grounds of argument insisted on by his asso-
ciate. But as they have been already fully stated
in the report of Mr. Berrien's argument, it has
not been thought necessary to repeat them.

The *Attorney General,* for the appellants, in
reply, answered the objection, that the only ques-
tion presented by the pleadings, on the part of
the United States, was, whether this was a trade
in breach of the Slave Trade Acts? He insisted,
that as the libels filed by the Spanish and Portu-
guese Consuls, demanded restitution upon the

ground of the illegal armament in our ports, and the claim, or defensive allegation, given in by the United States, resisted that demand upon two specific grounds: 1st. That the Africans were taken on board with intent to import the same, &c.; and, 2dly. That the vessel was found hovering on the coast with the same persons on board; if the testimony disclosed a case on which it would be proper for the United States to interpose, which was not reached by the pleadings, the consequence would be, not that the decrees should be affirmed, but that the cause would be remanded, with directions to amend. And, supposing the United States to have made no case by their pleadings, the question was, have the libellants made a case which justifies the decree? The Africans are parties to the cause, at least such of them as are free; and even if the other parties had colluded to make a case for restitution, they would still have been entitled to the protection of the Court.

As to the seizure by the revenue cutter, he insisted that it was justifiable under the Slave Trade Act of the 2d of March, 1807, s. 7. which forfeits " *any ship or vessel found hovering on the coast of the United States,* having on board any negro, mulatto, or person of colour, for the purpose of selling them as slaves, or with intent to land the same in any port or place within the jurisdiction of the United States." This act made no distinction as to the national character of the ship, whether it belonged to citizens or foreigners. So, also, the act of the 15th of May, 1820, c. 113. s. 5. makes the slave trade

piracy, where it is carried on by citizens of the
United States. So that, whether we regard the
predicament of the *vessel*, or of the *persons* en-
gaged in the transaction, the seizure was fully
warranted by the laws applicable to the case.
Captain Jackson performed only an act of duty
in capturing and bringing in the vessel for adju-
dication.

The question, then, recurs, what was the con-
dition of the Africans thus brought in, as defined
by our laws; which must be the rule to guide the
determination of the Court. They are placed
under the protection of those laws, and are,
*prima facie,* free. On whom, then, is the *onus
probandi* thrown? Being here rightfully, they
are under the protection of our laws and Courts
of justice. No person can claim a right to take
them from the custody of the Court, and carry
them away into slavery, but those who can prove
them to be slaves; who can prove it, by such
evidence as ought alone to be held sufficient in a
question of freedom or slavery. This view of
the case settles the question of the burthen of
proof. He who would seek to disturb the appa-
rently rightful condition of things, assumes the
burthen of proving his own right. This is the
ordinary doctrine of the Court of Admiralty, if
the seizure has been rightful, and the case is,
*prima facie,* a case for condemnation. The
*onus probandi* is thrown upon the claimant to
prove his property, and his right to restitution.
But, in the present case, the rule is peculiarly
applicable, and the clearness and fulness of the

proof ought to be in proportion to the importance of the matter in controversy. The case is one of human liberty. The Africans stand before the Court as if brought up before it upon a *habeas corpus.* Suppose them here, on such a process, asserting their freedom, and claiming your protection; what kind of proof would you exact from those who claim to hold them in slavery? Most certainly you would not demand inferior evidence to that which you require in a case of life or death. The witnesses must present themselves fairly before you. Their statements must be clear and consistent, and such as to command the confidence of the Court. They must be sustained by the documentary evidence; and, where any doubt is left, the decision should be *in favorem libertatis.*

The claimants wish the Court to consider this as a question exclusively between Spain on one side, and the United States on the other, in which these persons are to be considered as " effects," and " merchandise," taken by pirates, and as such liable to restitution under the stipulations of the treaty of 1795. But is the Court at liberty so to consider them, under the laws of our own country? Some of them are confessedly free, because the decree has established the fact. Which of them are slaves, it is impossible to determine by any rule of evidence known to our practice. The claimants must prove their property; and this involves the necessity of proving that these persons are property. They must prove that they are *property*, and that they are

*their* property.   Possession may be a sufficient
*indicium* of property, in those places where the
local law makes a particular subject property.
The local laws of some of the States, generally
make persons of colour, *prima facie*, slaves, and
throw the burthen of proof upon them to show
the contrary.    But even in those States, the
possession of a newly imported African would
not be evidence of property.    The question,
therefore, recurs, is it enough to justify the Court
in delivering up these persons to the parties for
whom they are claimed, to show a possession on
the high seas ?   Is the mere possession of such
persons a sufficient evidence of their slavery to
justify it in restoring them as claimed ?   The
question is not whether the cruisers of the Uni-
ted States have a right to seize a Spanish slave
ship upon the high seas, bring her in for adjudi-
cation, and throw the burthen of proof of pro-
prietary interest upon the claimants.   Any such
right of interference with foreign states, their
subjects, or people, is disclaimed.   But these
people are here, in the custody of the Court,
without any invasion of the sovereignty of fo-
reign nations on our part ; for the piratical vessel,
which took them out of other vessels sailing
under Spanish and Portuguese colours, was not
acting under the authority, or upon the responsi-
bility of the United States.   They are brought
here by a seizure authorized by our own laws,
and perfectly consistent with the sovereignty and
independence of Spain and Portugal.   The
laws, under which they were seized and brought

1825.

The Antelope.

in, declare them to be entitled to their freedom. Can the Court surrender them as slaves upon no other proof than mere naked possession? Is the possession of Africans, on the coast of Africa, sufficient evidence of title, *per se*, without connecting that possession with any law, international or municipal, to justify the Court in taking an active part in consigning to slavery these persons, thus placed under its protection?

It is unnecessary for the United States to show, that the possession was *prima facie*, wrongful. The opposite parties, who call upon the active aid of the Court to maintain that possession, must prove that it was rightful.

The real question, then, is, whether the mere possession, under such circumstances, is sufficient evidence of title, not as against the United States, but as against these Africans? The Court will not shut their eyes to what is passing in the world. Such a possession may be evidence of title in some of the States of this Union, and in the European colonies. It might have been so formerly on the coast of Africa. But it is not so now, even under the municipal laws of Spain and Portugal. Both of these powers have prohibited the slave trade on the coast of Africa to the north of the line, since 1815. It was prohibited long before by the United States and Great Britain, on every part of the coast, and of the world. It has been prohibited by France, Holland, and all the principal maritime states of Europe. Under these circumstances, it is impossible for the Court to v, that possession or the coast of

Africa is so habitually found in connexion with
right, under the municipal laws of the country to
which the vessel belongs, as to constitute *prima
facie* evidence of property. The presumption
ought rather to be reversed. The natives of
Africa, however imperfect may be their civiliza-
tion, compose an independent nation. By the
general law of nations, they are as free as the
Spaniards, or the Portuguese. Hence, it may be
seen, that the mere possession of an African,
claiming him as a slave, by a Spanish ship, on
the coast of Africa, would no more prove the
African a slave, than the possession of a Spa-
niard, by an African ship on the coast of Spain,
would prove the Spaniard a slave. The actual
possessor must, therefore, show some other right
than mere possession. The Spaniard alleges,
that it has been the practice of the civilized and
christian nations of Europe, to make slaves of
the Africans for three centuries; and hence, that,
by the law of nations, he has a right to make
slaves of them. The African opens the volume
of the law of nations, and shows, that the foun-
dations of that code are laid in justice and huma-
nity, and that no legitimate right can grow out of
a violation of these principles. If he is answer-
ed, that the trade had its origin in humane motives,
he may well upbraid us for such a vindication. Nor
does the existence of slavery in the United States
form any excuse or palliation, for perpetuating,
and extending the guilt and misery of the slave
trade. Slavery was introduced among us, during
our colonial state, against the solemn remon-

strances of our legislative assemblies. Free America did not introduce it. She led the way in measures for prohibiting the slave trade. The revolution which made us an independent nation, found slavery existing among us. It is a calamity entailed upon us, by the commercial policy of the parent country.[a] There is no nation which has a right to reproach us with the supposed inconsistency of our endeavouring to extirpate the slave trade as carried on between Africa and America, whilst at the same time we are compelled to tolerate the existence of domestic slavery under our own municipal laws.

It may well be asked, whether Africa is without the pale of the law of nations. Are not Africans in their own country, under the protection of that law? If it be answered, that the condition of slavery has existed from time immemorial, growing out of the exercise of the rights of war, as understood and practised in that barbarous country, it may be replied, that those very wars have been stimulated by the arts and avarice of the slave traders. This fact is shown by the most conclusive evidence, in the examinations before the House of Commons in 1791. It appears also by the more recent reports of the American and British naval officers, and the agents of the London African Institution, and American Colonization Society. Unless, therefore, the slave traders can derive a right, founded

a Hargrave's Argument, in Somersett's case; 11 *State Trials*, 346.

upon wrong practised at their instigation, this argument cannot avail them.

Their possession, then, derives no support from the law of nations. Supposing that by the municipal law of Spain these persons are slaves, whilst by your law they are free; being brought into this country without any trespass on the sovereign rights of Spain, is the Court bound to restore them from comity? If the general law of nations binds us to do this, it also binds us to deliver up persons charged with crimes, or even with political offences. But this is a principle which has been repudiated by all nations.[a] The stipulation in the Spanish treaty, by which we are bound to restore the ships and effects, or merchandise of Spanish subjects, when captured within our territorial jurisdiction, or by pirates on the high seas, does not apply. These Africans are not " effects," or " merchandise." To say that they are so, is to beg the whole question in controversy. The opinions of the twelve Judges of England, and of the law officers of the Crown, in 1689, which have been cited to show that negroes were considered as *merchandise*, within the terms of the Navigation Act, only prove that they were so considered at that time with reference to the British colonies, into which their importation was then permitted. Even at that period, negroes in England were not considered as merchandise, or the objects of traffic, or liable to be held in servitude. Every thing must depend upon the law

[a] Somerset's Case, 11 State Trials 339. 346.

1825.

The Antelope.

prevailing at the time and place.   By the law applicable to this case, these persons are free ; they annot, therefore, be considered as merchandise or effects within the treaty.

*March 18th.*    Mr. Chief Justice MARSHALL delivered the opinion of the Court, and, after stating the case, proceeded as follows :

In prosecuting this appeal, the United States assert no property in themselves.   They appear in the character of guardians, or next friends, of these Africans, who are brought, without any act of their own, into the bosom of our country, insist on their right to freedom, and submit their claim to the laws of the land, and to the tribunals of the nation.

The Consuls of Spain and Portugal, respectively, demand these Africans as slaves, who have, in the regular course of legitimate commerce, been acquired as property by the subjects of their respective sovereigns, and claim their restitution under the laws of the United States.

How far the slave trade is contrary to the law of nature, and nations.    In examining claims of this momentous importance ; claims in which the sacred rights of liberty and of property come in conflict with each other ; which have drawn from the bar a degree of talent and of eloquence, worthy of the questions that have been discussed ; this Court must not yield to feelings which might seduce it from the path of duty, and must obey the mandate of the law.

That the course of opinion on the slave trade should be unsettled, ought to excite no surprise. The Christian and civilized nations of the world,

with whom we have most intercourse, have all
been engaged in it. However · abhorrent this traffic may be to a mind whose original feelings are not blunted by familiarity with the practice, it has been sanctioned in modern times by the laws of all nations who possess distant colonies, each of whom has engaged in it as a common commercial business which no other could rightfully interrupt. It has claimed all the sanction which could be derived from long usage, and general acquiescence. That trade could not be considered as contrary to the law of nations which was authorized and protected by the laws of all commercial nations ; the right to carry on which was claimed by each, and allowed by each.

The course of unexamined opinion, which was founded on this inveterate usage, received its first check in America ; and, as soon as these States acquired the right of self-government, the traffic was forbidden by most of them. In the beginning of this century, several humane and enlightened individuals of Great Britain devoted themselves to the cause of the Africans ; and, by frequent appeals to the nation, in which the enormity of this commerce was unveiled, and exposed to the public eye, the general sentiment was at length roused against it, and the feelings of justice and humanity, regaining their long lost ascendency, prevailed so far in the British parliament as to obtain an act for its abolition. The utmost efforts of the British government, as well as of that of the United States, have since been as-

siduously employed in its suppression. It has been denounced by both in terms of great severity, and those concerned in it are subjected to the heaviest penalties which law can inflict. In addition to these measures operating on their own people, they have used all their influence to bring other nations into the same system, and to interdict this trade by the consent of all.

Public sentiment has, in both countries, kept pace with the measures of government; and the opinion is extensively, if not universally entertained, that this unnatural traffic ought to be suppressed. While its illegality is asserted by some governments, but not admitted by all; while the detestation in which it is held is growing daily, and even those nations who tolerate it in fact, almost disavow their own conduct, and rather connive at, than legalize, the acts of their subjects; it is not wonderful that public feeling should march somewhat in advance of strict law, and that opposite opinions should be entertained on the precise cases in which our own laws may control and limit the practice of others. Indeed, we ought not to be surprised, if, on this novel series of cases, even Courts of justice should, in some instances, have carried the principle of suppression farther than a more deliberate consideration of the subject would justify.

The *Amedie*, (1 *Acton's Rep.* 240.) which was an American vessel employed in the African trade, was captured by a British cruiser, and condemned in the Vice Admiralty Court of Tortola.

An appeal was prayed; and Sir William Grant, in
delivering the opinion of the Court, said, that the
trade being then declared unjust and unlawful by
Great Britain, "a claimant could have no right,
upon principles of universal law, to claim restitu-
tion in a prize Court, of human beings carried as
his slaves. He must show some right that has
been violated by the capture, some property of
which he has been dispossessed, and to which he
ought to be restored. In this case, the laws of
the claimant's country allow of no right of pro-
perty such as he claims. There can, therefore,
be no right of restitution. The consequence is,
that the judgment must be affirmed."

The *Fortuna* (1 *Dodson's Rep.* 81.) was con-
demned on the authority of the *Amedie*, and the
same principle was again affirmed.

The *Diana* (1 *Dodson's Rep.* 95.) was a Swe-
dish vessel, captured with a cargo of slaves, by
a British cruiser, and condemned in the Court of
Vice Admiralty at Sierra Leone. This sentence
was reversed on appeal, and Sir William Scott,
in pronouncing the sentence of reversal, said,
" the condemnation also took place on a princi-
ple which this Court cannot in any manner re-
cognise, inasmuch as the sentence affirms, ' that
the slave trade, from motives of humanity, hath
been abolished by most civilized nations, *and is
not, at the present time, legally authorized by any.*'
This appears to me to be an assertion by no means
sustainable." The ship and cargo were restored,
on the principle that the trade was allowed by
the laws of Sweden.

1825.

The Antelope.

1825.          The principle common to these cases is, that

The Antelope. the legality of the capture of a vessel engaged in the slave trade, depends on the law of the country to which the vessel belongs.   If that law gives its sanction to the trade, restitution will be decreed; if that law prohibits it, the vessel and cargo will be condemned as good prize.

This whole subject came on afterwards to be considered in the *Louis*, (2 *Dodson's Rep.* 238.) The opinion of Sir William Scott, in that case, demonstrates the attention he had bestowed upon it, and gives full assurance that it may be considered as settling the law in the British Courts of Admiralty as far as it goes.

The *Louis* was a French vessel, captured on a slaving voyage, before she had purchased any slaves, brought into Sierra Leone, and condemned by the Vice Admiralty Court at that place.   On an appeal to the Court of Admiralty in England, the sentence was reversed.

In the very full and elaborate opinion given on this case, Sir William Scott, in explicit terms, lays down the broad principle, that the right of search is confined to a state of war.   It is a right strictly belligerent in its character, which can never be exercised by a nation at peace, except against professed pirates, who are the enemies of the human race.   The act of trading in slaves, however detestable, was not, he said, "the act of freebooters, enemies of the human race, renouncing every country, and ravaging every country, in its coasts and vessels, indiscriminately."   It was not piracy.

He also said, that this trade could not be pronounced contrary to the law of nations. "A Court, in the administration of law, cannot attribute criminality to an act where the law imputes none. It must look to the legal standard of morality; and, upon a question of this nature, that standard must be found in the law of nations, as fixed and evidenced by general, and ancient, and admitted practice, by treaties, and by the general tenor of the laws and ordinances, and the formal transactions of civilized states; and, looking to those authorities, he found a difficulty in maintaining that the transaction was legally criminal."

The right of visitation and search being strictly a belligerent right, and the slave trade being neither piratical, nor contrary to the law of nations, the principle is asserted and maintained with great strength of reasoning, that it cannot be exercised on the vessels of a foreign power, unless permitted by treaty. France had refused to assent to the insertion of such an article in her treaty with Great Britai and, consequently, the right could not be exercised on the high seas by a British cruiser on a French vessel.

"It is pressed as a difficulty," says the Judge, "what is to be done, if a French ship, laden with slaves, is brought in? I answer, without hesitation, restore the possession which has been unlawfully devested; rescind the illegal act done by your own subject, and leave the foreigner to the justice of his own country."

This reasoning goes far in support of the pro-

position, that, in the British Courts of admiralty, the vessel even of a nation which had forbidden the slave trade, but had not conceded the right of search, must, if wrongfully brought in, be restored to the original owner. But the Judge goes farther, and shows, that no evidence existed to prove that France had, by law, forbidden that trade. Consequently, for this reason, as well as for that previously assigned, the sentence of condemnation was reversed, and restitution awarded.

In the United States, different opinions have been entertained, in the different Circuits and Districts; and the subject is now, for the first time, before this Court.

The question, whether the slave trade is prohibited by the law of nations has been seriously propounded, and both the affirmative and negative of the proposition have been maintained with equal earnestness.

That it is contrary to the law of nature will scarcely be denied. That every man has a natural right to the fruits of his own labour, is generally admitted; and that no other person can rightfully deprive him of those fruits, and appropriate them against his will, seems to be the necessary result of this admission. But from the earliest times war has existed, and war confers rights in which all have acquiesced. Among the most enlightened nations of antiquity, one of these was, that the victor might enslave the vanquished. This, which was the usage of all, could not be pronounced repugnant to the law of nations, which is certainly to be tried by the test of

neral usage.. That which has received the assent
of all,. must be the law of all.

1825.

The Antelope.

Slavery, then, has its origin in force ; but as
the world has agreed that it is a legitimate result.
of force, the state of things which is thus produ-
ced by general consent, cannot be pronounced
unlawful.

Throughout Christendom, this harsh rule has.
been exploded, and war is no longer considered
as giving a right to enslave captives. But this tri-
umph of humanity has not been universal: The
parties to the modern law of nations do not pro-
pagate their principles by force ; and Africa has
not yet adopted them.' Throughout the whole
extent of that immense continent, so far as we
know its history, it is still the law of nations that
prisoners are slaves. Can those who have them-
selves renounced this law, be permitted to partici-
pate in its effects by purchasing the beings who
are its victims ?

Whatever might be the answer of a moralist
to this question, a jurist must search for its legal
solution, in those principles of action which are
sanctioned by the usages, the national acts, and.
the general assent, of that portion of the world
of which he considers himself as a part, and to
whose law the appeal is made. If we resort to
this standard as the test of international law, the
question, as has already been observed, is de-
cided in favour of the legality of the trade. Both
Europe and America embarked in it ; and for
nearly two centuries, it was carried on without
opposition, and without censure. A jurist could

The Antelope.

not say, that a practice thus supported was illegal, and that those engaged in it might be punished, either personally, or by deprivation of property.

In this commerce, thus sanctioned by universal assent, every nation had an equal right to engage. How is this right to be lost? Each may renounce it for its own people; but can this renunciation affect others?

No principle of general law is more universally acknowledged, than the perfect equality of nations. Russia and Geneva have equal rights. It results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone. A right, then, which is vested in all by the consent of all, can be devested only by consent; and this trade, in which all have participated, must remain lawful to those who cannot be induced to relinquish it. As no nation can prescribe a rule for others, none can make a law of nations; and this traffic remains lawful to those whose governments have not forbidden it.

If it is consistent with the law of nations, it cannot in itself be piracy. It can be made so only by statute; and the obligation of the statute cannot transcend the legislative power of the state which may enact it.

If it be neither repugnant to the law of nations, nor piracy, it is almost superfluous to say in this Court, that the right of bringing in for adjudication in time of peace, even where the vessel belongs to a nation which has prohibited the trade,

cannot exist. The Courts of no country execute the penal laws of another; and the course of the American government on the subject of visitation and search, would decide any case in which that right had been exercised by an American cruiser, on the vessel of a foreign nation, not violating our municipal laws, against the captors.

It follows, that a foreign vessel engaged in the African slave trade, captured on the high-seas in time of peace, by an American cruiser, and brought in for adjudication, would be restored.

The general question being disposed of, it remains to examine the circumstances of the particular case.

The Antelope, a vessel unquestionably belonging to Spanish subjects, was captured while receiving a cargo of Africans on the coast of Africa, by the Arraganta, a privateer which was manned in Baltimore, and is said to have been then under the flag of the Oriental republic. Some other vessels, said to be Portuguese, engaged in the same traffic, were previously plundered, and the slaves taken from them, as well as from another vessel then in the same port, were put on board the Antelope, of which vessel the Arraganta took possession, landed her crew, and put on board a prize master and prize crew. Both vessels proceeded to the coast of Brazil, where the Arraganta was wrecked, and her captain and crew either lost or made prisoners.

The Antelope, whose name was changed to the General Ramirez, after an ineffectual attempt

*1825.*

*The Antelope.*

*The Spanish claim.*

to sell the Africans on board at Surinam, arrived off the coast of Florida, and was hovering on that coast, near that of the United States, for several days. Supposing her to be a pirate, or a vessel wishing to smuggle slaves into the United States, Captain Jackson, of the revenue cutter Dallas, went in quest of her, and finding her laden with slaves, commanded by officers who were citizens of the United States, with a crew who spoke English, brought her in for adjudication.

She was libelled by the Vice Consuls of Spain and Portugal, each of whom claim that portion of the slaves which were conjectured to belong to the subjects of their respective sovereigns; which claims are opposed by the United States on behalf of the Africans.

On whom the onus probandi is thrown in this case.
In the argument, the question on whom the *onus probandi* is imposed, has been considered as of great importance, and the testimony adduced by the parties has been critically examined. It is contended, that the Antelope, having been wrongfully dispossessed of her slaves by American citizens, and being now, together with her cargo, in the power of the United States, ought to be restored, without farther inquiry, to those out of whose possession she was thus wrongfully taken. No proof of property, it is said, ought to be required. Possession is in such a case evidence of property.

Conceding this as a general proposition, the counsel for the United States deny its application to this case. A distinction is taken between

*men*, who are generally free, and *goods*, which are always property. Although, with respect to the last, possession may constitute the only proof of property which is demandable, something more is necessary where men are claimed. Some proof should be exhibited that the possession was legally acquired. A distinction has been also drawn between Africans unlawfully taken from the subjects of a foreign power by persons acting under the authority of the United States, and Africans first captured by a belligerent privateer, or by a pirate, and then brought rightfully into the United States, under a reasonable apprehension that a violation of their laws was intended. Being rightfully in the possession of an American Court, that Court, it is contended, must be governed by the laws of its own country; and the condition of these Africans must depend on the laws of the United States, not on the laws of Spain and Portugal.

Had the Arraganta been a regularly commissioned cruiser, which had committed no infraction of the neutrality of the United States, her capture of the Antelope must have been considered as lawful, and no question could have arisen respecting the rights of the original claimants. The question of prize or no prize belongs solely to the Courts of the captor. But, having violated the neutrality of the United States, and having entered our ports, not voluntarily, but under coercion, some difficulty exists respecting the extent of the obligation to restore, on the mere

proof of former possession, which is imposed on this government.

If, as is charged in the libels of both the Consuls, as well as of the United States, she was a pirate, hovering on the coast with intent to introduce slaves in violation of the laws of the United States, our treaty requires that property rescued from pirates shall be restored to the Spanish owner on his making proof of his property.

Whether the General Ramirez, originally the Antelope, is to be considered as the prize of a commissioned belligerent ship of war unlawfully equipped in the United States, or as a pirate, it seems proper to make some inquiry into the title of the claimants.

In support of the Spanish claim, testimony is produced, showing the documents under which the Antelope sailed from the Havana on the voyage on which she was captured; that she was owned by a Spanish house of trade in that place; that she was employed in the business of purchasing slaves, and had purchased and taken on board a considerable number, when she was seized as prize by the Arraganta.

Whether, on this proof, Africans brought into the United States, under the various circumstances belonging to this case, ought to be restored or not, is a question on which much difficulty has been felt. It is unnecessary to state the reasons in support of the affirmative or negative answer to it, because the Court is divided on it, and, consequently, no principle is settled. So much of the decree of the Circuit Court as di-

rects restitution to the Spanish claimant of the    1825.
Africans found on board the Antelope when she    The Antelope.
was captured by the Arraganta, is affirmed.

There is some difficulty in ascertaining their number. The libel claims one hundred and fifty as belonging to Spanish subjects, and charges that one hundred or more of these were on board the Antelope. Grondona and Ximenes, Spanish officers of the Antelope before her capture, both depose positively to the number of one hundred and sixty-six. Some deduction, however, is to be made from the weight of Grondona's testimony, because, he says, in one of his depositions, that he did not count the slaves on the last day when some were brought on board, and adds, that he had lost his papers, and spoke from memory, and from the information he had received from others of the crew, after his arrival in the Havana. Such of the crew as were examined, concur with Grondona and Ximenes as to numbers.

The depositions of the Spanish witnesses on this point, are opposed by those of John Smith, the Captain of the General Ramirez, and William Brunton, one of the crew of the Arraganta, who was transferred to the Antelope.

John Smith deposes, that ninety-three Africans were found on board the Antelope when captured, which he believes to have been Spanish property. He also says, that one hundred and eighty-three were taken out of Portuguese vessels.

William Brunton deposes, that more slaves

were taken out of the Portuguese ship than were in any other, and that ninety odd were represented by the crew to have been on board the Antelope when she was captured.

If, to the positive testimony of these witnesses, we add the inference to be drawn from the statement of the libel, and the improbability that so large a number of Africans as are claimed could have been procured, under the circumstances in which the Antelope was placed, between the 13th, when she was liberated by the first pirate who seized her, and the 23d, when she was finally captured, we are rather disposed to think the weight of testimony is in favour of the smaller number. But supposing perfect equality in this respect, the decision ought, we think, to be against the claimant.

Whatever doubts may attend the question whether the Spanish claimants are entitled to restitution of all the Africans taken out of their possession with the Antelope, we cannot doubt the propriety of demanding ample proof of the extent of that possession. Every legal principle which requires the plaintiff to prove his claim in any case, applies with full force to this point; and no countervailing consideration exists. The *onus probandi*, as to the number of Africans which were on board when the vessel was captured, unquestionably lies on the Spanish libellants. Their proof is not satisfactory beyond ninety-three. The individuals who compose this number must be designated to the satisfaction of the Circuit Court.

We proceed next to consider the libel of the Vice-Consul of Portugal. It claims one hundred and thirty slaves, or more, " all of whom, as the libellant is informed and believes," are the property of a subject or subjects of his Most Faithful Majesty; and although " the rightful owners of such slaves be not at this time individually and certainly known to the libellant, he hopes and expects soon to discover them."

John Smith, and William Brunton, whose depositions have already been noticed, both state, that several Africans were taken out of Portuguese vessels; but neither of them state the means by which they ascertained the national character of the vessels they had plundered. It does not appear that their opinions were founded on any other fact than the flag under which the vessels sailed. Grondona, also, states the plunder of a Portuguese vessel, lying in the same port, and engaged in the same traffic with the Antelope when she was captured; but his testimony is entirely destitute of all those circumstances which would enable us to say, that he had any knowledge of the real character of the vessel, other than was derived from her flag. The cause furnishes no testimony of any description, other than these general declarations, that the proprietors of the Africans now claimed by the Vice-Consul of Portugal, were the subjects of his king; nor is there any allusion to the individuals to whom they belong. These vessels were plundered in March, 1820, and the libel was filed in August of the same year, From

1825.

The Antelope.

that time to this, a period of more than five years, no subject of the crown of Portugal has appeared to assert his title to this property, no individual has been designated as its probable owner. This inattention to a subject of so much real interest, this total disregard of a valuable property, is so contrary to the common course of human action, as to justify serious suspicion that the real owner dares not avow himself.

That Americans, and others, who cannot use the flag of their own nation, carry on this criminal and inhuman traffic under the flags of other countries, is a fact of such general notoriety, that Courts of admiralty may act upon it. It cannot be necessary to take particular depositions, to prove a fact which is matter of general and public history. This long, and otherwise unaccountable absence, of any Portuguese claimant, furnishes irresistible testimony, that no such claimant exists, and that the real owner belongs to some other nation, and feels the necessity of concealment.

An attempt has been made to supply this defect of testimony, by adducing a letter from the secretary to whose department the foreign relations of Portugal are supposed to be intrusted, suggesting the means of transporting to Portugal those slaves which may be in the possession of the Vice-Consul, as the property of his fellow subjects. Allow to this document all the effect which can be claimed for it, and it can do no more than supply the want of an express power

from the owners of the slaves to receive them.
It cannot be considered as ascertaining the own-
ers, or as proving their property.

The difficulty, then, is not diminished by this
paper. These Africans still remain unclaimed
by the owner, or by any person professing to
know the owner. They are rightfully taken from
American citizens, and placed in possession of
the law. No property whatever in them is shown.
It is said, that possession, in a case of this de-
scription, is equivalent to property. Could this
be conceded, who had the possession? From
whom were they taken by the Arraganta? It is
not alleged that they are the property of the
crown, but of some individual. Who is that in-
dividual? No such person is shown to exist, and
his existence, after such a lapse of time, cannot
be presumed.

The libel, which claims them for persons en-
tirely unknown, alleges a state of things which
is *prima facie* evidence of an intent to violate the
laws of the United States, by the commission of
an act which, according to those laws, entitles
these men to freedom. Nothing whatever can
interpose to arrest the course of the law, but the
title of the real proprietor. No such title ap-
pears, and every presumption is against its ex-
istence.

We think, then, that all the Africans, now in
possession of the Marshal for the District of
Georgia, and under the control of the Circuit
Court of the United States for that District,
which were brought in with the Antelope, other-

wise called the General Ramirez, except those which may be designated as the property of the Spanish claimants, ought to be delivered up to the United States, to be disposed of according to law. So much of the sentence of the Circuit Court as is contrary to this opinion, is to be reversed, and the residue affirmed.

DECREE. This cause came on to be heard, &c.; On consideration whereof, this Court is of opinion, that there is error in so much of the sentence and decree of the said Circuit Court, as directs the restitution to the Spanish claimant of the Africans in the proceedings mentioned, in the ratio which one hundred and sixty-six bears to the whole number of those which remained alive at the time of pronouncing the said decree; and also in so much thereof, as directs restitution to the Portuguese claimant; and that so much of the said decree ought to be reversed, and it is hereby reversed and annulled. And this Court, proceeding to give such decree as the said Circuit Court ought to have given, doth DIRECT and ORDER, that the restitution to be made to the Spanish claimant, shall be according to the ratio which ninety-three (instead of one hundred and sixty-six) bears to the whole number, comprehending as well those originally on board the Antelope, as those which were put on board that vessel by the Captain of the Arraganta. After making the apportionment according to this ratio, and deducting from the number the rateable loss which must fall on the slaves to which the Spanish claimants were originally entitled, the

residue of the said ninety-three are to be deliver-
ed to the Spanish claimant, on the terms in the said
decree mentioned; and all the remaining Afri-
cans are to be delivered to the United States, to
be disposed of according to law ; and the said
decree of the said Circuit Court is, in all things
not contrary to this decree, affirmed.