Tucker, P.
In considering this case I concede at once that under our law the habeas corpus is not the proper method of trying the right to freedom. The act of 1795 has prescribed the remedy which the negro must pursue, declaring that he must present his petition, in the manner prescribed by the act, to the court of the county in which the master or holder dwells, and not elsewhere. 1 Rev. Code, ch. 124. § 4. p. 481. Anteriour to this act, the habeas corpus and homine replegiando were resorted to by slaves asserting a,right to freedom; but as these remedies proved vexatious and unsafe, a new proceeding was prescribed by the act already cited, the homine replegiando was repealed, and the habeas corpus was considered as no longer appropriate. It is observable, however, that there is no provision in the act, which denies' the habeas corpus to a free person illegally confined in custody, although he be a person of colour; nor can I believe it ever was designed to exclude any freeman whatever from the benefit of this great and salutary writ. Where, indeed, upon the face of the petition it appears that the case presents a litigated question as to the right of a negro to his freedom, the writ should be refused as inappropriate to the case. Where this does not appear by the petition, but comes out in the return, and is sustained by the proofs, the party should be remanded, or sent before a justice of peace to make his complaint according to law. But where the petition shews forth the definitive documentary evidence of his freedom, authenticated in the form prescribed by the statute, it is believed that unless such evidence is denied to be genuine, or unless he is claimed by a title in conflict with that under which the emancipation is set up, he is entitled to a discharge if he be detained without lawful authority. To suppose that a free negro, in possession of regular “free papers,” may be falsely imprisoned at the pleasure of any individual, without redress, is indeed to attribute a gross and lamentable *444 omission to the law. To confine that redress to a suit , ... m forma pauperis to establish his freedom, when he already has the conclusive evidence of it in his hands, would be a mockery. Cui bono establish it, if when established, it is disregarded, and affords no protection against the most wanton violation of his rights and liberty? It cannot be. A free negro, as well as a free white man, must be entitled to the benefit of the habeas corpus act, both according to its language, which is broad and general, and still more according to its spirit, which is yet more liberal and beneficent. If it were otherwise, that wretched class would be altogether without protection from the grossest outrages, and their personal liberty would be an unsubstantial shadow. In such cases therefore, the court must exercise a sound discretion, discharging the party where there seems to be no real litigation as to the right to freedom, and remitting him to his suit in forma pauperis where there is.
The case is still stronger, I conceive, where upon the return to the habeas corpus it appears that there is no claim to hold the petitioner as a slave. Though the habeas corpus is not the proper remedy where the matter in question is the right to freedom, yet where there is no contest about that right, but the litigation arises out of other matters, it would be absurd to send the petitioner to sue in forma, pauperis. In like manner, it is conceived that if the remedy by petition to sue in forma pauperis cannot be resorted to, the remedy by habeas corpus must of course prevail. Such is the case here. The defence is in substance, “I do not myself claim title to the petitioner as my slave; but he is black; the presumption is in favour of slavery, and I verily believe he belongs to some one, though I don’t know to whom.” Upon this return, could the court remand the prisoners to the wrongdoer’s possession to sue in forma pauperis^ Whom should they sue? Their owners, if the petitioners be really slaves, are confessedly unknown. Shall they sue *445 the vice consul? He does not claim them, and the stalute only provides for the institution of a suit against the owner. A verdict in an action against the vice consul could indeed do them no good, since it would be evidence against nobody else, and would furnish them with no protection against imprisonment by others. Shall they then be restored to their close confinement until the vice consul shall hunt up their masters? What assurance have we from this affidavit, that he will ever be able to discover the owners, who are to him now unknown ? What confidence indeed can be placed in the general and broad assertion, unaccompanied by a single reason, that these persons are slaves though their owners are unknown? I do not question the sincerity of the vice consul’s belief but I do not think it can furnish ground for judicial action. Slavery implies the relation of two persons in the character of master and slave, and it is difficult to conceive that he has good cause to believe in the existence of the relation, to whom one of the parties to that relation is utterly unknown. I do not say it is impossible, because the parties may themselves confess that they are slaves, without disclosing their masters’ names. But this does not appear; and for aught that does appear, this return rests upon the vague presumption that the petitioners are slaves because they are black, and slaves to portuguese subjects because they came from Santiago. Upon such grounds, I do not think the circuit court would have been justified in remanding them. It could not be right to restore these petitioners to the custody of the vice consul, who might have forthwith sent them off to Santiago as the readiest method of finding out their masters. It could not be right to consign them to irremediable slavery, upon the remote possibility of the vice consul’s finding owners for them in the island from which they came. No such speculation could justify their further imprisonment.
*446 It is said, however, to have been decided by the supreme court of the United States, “ that the vice conSul has a right to interpose to protect or lay claim to property for the subjects of the nation which he represents,” 6 Wheat. 152. and that such claim may be sustained though the owners are unknown. 10 Wheat. 66. It is not denied that in the first of these cases the vice consul was declared to be “ a competent party to assert or defend the rights of property of the individuals of his nation, in any court having jurisdiction of causes affected by the application of international law.” The principle here laid down I consider as incontrovertible, though it is obvious that it does not in terms extend to any other courts than those having jurisdiction over questions of international law. Admitting, however, that even in our courts the firmly established rule, that no person shall assert the rights of property by suit except the owner, will yield to the national privileges of the consul, it still remains to be examined how far this claim of property will be sustained although the owners are unknown.
In the case cited from 10 Wheat. 66. it appears that the Antelope, a vessel unquestionably belonging to Spanish subjects (whose individuality does not appear to have been known) and loaded with slaves from Africa, was seized by the revenue cutter Dallas and brought in for adjudication. She was libelled by the vice consuls of Spain and Portugal, each of whom claimed a portion of the slaves, which were conjectured to belong to the subjects of their respective sovereigns. In support of the Spanish claim, testimony was produced, shewing the documents under which the Antelope sailed from Savanna ;—that she was owned by a Spanish house of trade in that place; that she was employed in the business of purchasing slaves on the african coast, and had purchased and taken on board a considerable number when she was seized as a prize by the Arraganta. The claim *447 of the vice consul upon this evidence was sustained; but the claim of the porluguese consul was rejected. Now’' it is observable that the Spanish proofs went the whole length of establishing the existence of an individual proprietary interest. They proved that the cargo were slaves (for they were purchased in Africa) and they proved the vessel to belong to a house in Huvanna who employed her in the slave trade. The proof that there was individual right tv as therefore plenary. But even had it been less so, and had the vice consul been entitled to a sentence in his favour, upon full proof that the vessel was an african slave trader belonging to Spain, even though the owners were unknown, yet the case would still be very different from the case at bar. There, the vessel being a slaver, and the cargo being proved to have been purchased and taken on board on the african coast, the proof that the negroes were property was complete. It was not necessary to know the names of the owners to establish that fact,—to prove the relation of master and slaves. The master and supercargo were in possession of these slaves, whom they had purchased either for themselves or their owners. The fact of the purchase, whereby these men became property, was proved: the fact therefore that they were slaves was established, and the question what Spanish subject had a right to them might perhaps be most proper to be settled by the Spanish authorities after they were given up. But in this case there is no proof at all that the petitioners are property, other than the presumption arising from their colour, which will be presently adverted to. Independent of that, there is no evidence of property in them. Their owners being unknown, it cannot be affirmed that they have a master; and without a master they cannot be slaves. The proof of the existence of a known master is wanted here to establish the fact that these men are property; not to ascertain merely whose property they are. Admit then that *448 the consul may recover what is property, for an un- . J , * V J . , known owner, yet he cannot recover men without satisfactory evidence of the existence of an owner, since without an owner they are not property.
It is said, however, that the presumption from their colour is that they are slaves. This is the rule indeed established among us; Hudgins v. Wright, 1 Hen. & Munf. 141. The application of this principle, even to slaves brought into the country in an african slave ship seized by the vessels of the U. States, is however very strongly contested by learned counsel, in the argument of the case of the Antelope. The distinguished attorney general (Mr. Wirt) in particular, enlarges upon this point. For my own part, I am much inclined to doubt whether it is a principle which should be applied to foreigners. I do not, however, think it necessary to express any decided opinion upon the point, as in this case any such presumption is decidedly rebutted by the proofs. Two white men of Santiago, who stand unimpeached and uncontradicted, depose that the petitioners were foreigners, born out of the United States; that the witnesses had known them for many years in the island of Santiago; that they were free men in that island; that three of them had been soldiers in the Portuguese army; that they came with the witnesses to this country; that they were brought up with others from Norfolk on the charge of piracy, and were acquitted and discharged, since which it appears they were seized and imprisoned through the agency of the vice consul. Upon this testimony the question is presented, Whether these foreigners, who have been brought here by compulsion on a charge of piracy and discharged, and have since been cast into prison without authority upon the vague suspicion that they are slaves, shall be remanded to close confinement, although it is proved that they are free ? To the question so propounded, I answer in the negative. Nor can I think it proper to continue this *449 case over until the vice consul shall discover their masters, or abandon the search for them as fruitless.
An objection was made to the award of the habeas corpus on the affidavit of the party. That affidavit I do not consider as embraced by the inhibition against the introduction of the testimony of a negro against a white man. It is to be considered merely as laying a foundation upon which the court might proceed to award the writ, and is analogous to various other cases in the courts. For, notwithstanding the provisions of the act, I have never heard it doubled that a free negro who applies for an injunction or asks for a continuance, is competent to make the affidavit which the law requires in all such cases. Upon the whole matter, therefore, I am of opinion to affirm the judgment.
Brockenbrougii, Carr and Cabell, J. concurred.
Brooke, .7.
Differing from a majority of the court, with great deference for the opinion delivered, I shall very briefly state the grounds of my opinion. A very few of the facts in the record are material, I think, to the decision of the case. The petitioners, who are africans, claim to be free in the island of Bravo, from which they stale they carne. The claim of the Portuguese consul is that they were slaves to some of the subjects of Portugal, in the island of Santiago, and that if he is allowed four months he will ascertain to whom they belong. It is admitted that as slaves they are not entitled to the writ of habeas corpus, and that the question of property cannot be tried on the writ; but it is insisted that without a specification of their owners, the claim of property is not made out; and the cases decided by the supreme court, 6 Wheat. 152. and the case of the Antelope, 10 Wheat. 66. are relied on to show that the claim must state the individuals to whom they belong. These cases were not on a writ of habeas corpus, but cases in *450 which the right of property was solely to be tried, and the court decided that the claim of the consuls (as it was a proceeding in rcm) though the specific owners were not stated, was sufficient to try the question of property, but not enough to authorize the restoration of it. In the case before us, if the question of property could be tried on a writ of habeas corpus, the claim of the Portuguese consul would be sufficient, though it does not state the owners of the property, according to those decisions ; and as that question cannot be tried on the writ, if that issue is made up by the claim, the writ ought to be quashed. It is said to be hai'd to deprive the petitioners of the right to prove their freedom ; but that is the consequence of their colour and condition, not provided for by the law, nor can I distinguish their case from the case of persons of their colour, apprehended as slaves escaping from any of our sister states, without proof by the party apprehending them as to the persons to whom they belonged, and in which case I understand that the writ of habeas corpus, would not be the proper relief for them. I think the claim of the consul of a nation authorizing slavery in its islands, from which the petitioners admit they came, entitled to as much respect as the claim of a party apprehending persons of their colour, coming from any of our sister slaveholding states, who could not state to whom the property belonged. But weight is given to the testimony of two white persons, who swear that they saw the petitioners in the island of Santiago, and that there they were free people. Passing over the discrepancy between this, and the fact stated in the petition, that the petitioners came from the island of Bravo, the answer to it is, that it negatives the claim of the consul to them as slaves; a question which, if to be tried here, must be tried by the law of Portugal and not the law of Virginia; a question of freedom or slavery, which takes the case out of the jurisdiction of the judge on a writ *451 of habeas corpus. The hardship of this doctrine is no answer to the law of the case. In a forum having jurisdiction of the question of slavery, under our statutes, the colour of the party, showing that he is of african race, is prima facie evidence that he is a slave, and puts the onus on him to prove that he is free. This is one of the hardships that belong to his condition. On the contrary, the foundation of the right to the writ of habeas corpus is, that he is a free man ; and the word person in the act of habeas corpus, implies that he is free, and not one whose title to freedom can be questioned any where. The provision that he is to make affidavit and give bond before the writ can be obtained, implies the same. The provision in the english magna charta, 4 Co. Inst. 45. that no free man shall be taken or imprisoned &c. is the foundation of the writ of habeas corpus. But suppose the question of slavery was within the jurisdiction of the judge, and it was necessary that the consul should furnish evidence that the petitioners were owned by individuals in the island of Santiago: I think comity ought to have given him four months, what the claimant asked to produce the proof. I think also, that instead of discharging them, they ought to have been delivered to the proper officer, under our act prohibiting free people of colour to come into and remain in the state, and subjecting them to be apprehended and sent back. Upon the whole, I think the petitioners, if really free, mistook their remedy, and ought to have pursued that which is prescribed by the act authorizing persons of colour to sue for their freedom in forma pauperis. Looking to the policy of our laws, I fear that this decision of the court will lead to consequences directly in conflict with it, and that the judgment of the court below ought to be reversed and the writ quashed.