KILTON, WARREN & CO. *vs.* PROVIDENCE TOOL CO. *et al.*

| 22 | 605 |
|----|-----|
| 25 | 148 |
| e25 | 233 |
| 22 | 605 |
| 27 | 126 |

PROVIDENCE—APRIL 26, 1901.

PRESENT : Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Stockholders' Liability. Accrual of Right of Action.*

Under the provisions of Pub. Laws cap. 600, of March 27, 1877 (now Gen. Laws cap. 180, § 22), an action to enforce the liability of stockholders for the debts of a manufacturing corporation does not accrue until the creditor has exhausted his remedy against the corporation, although the liability attaches to the stockholder when the debt is incurred.

(2) *Statutes of Limitation. Penal Liability.*

Gen. Laws cap. 288, § 8, providing that all suits founded upon any penal statute wholly or in part for the use of the prosecutor shall be brought within one year, has no application to an action against a stockholder under Gen. Laws cap. 180, § 22 ; but the statute applicable in such case is Gen. Laws cap. 234, § 4, which allows twenty years for bringing an action of debt on a specialty, since, although the provisions of Pub. Laws cap. 555, of April 20, 1876 (now Gen. Laws cap. 180, § 13), imposing special liabilities upon stockholders of manufacturing corporations in cases of non-performance of statutory duties, are of a penal character, they are not within the meaning of Gen. Laws cap. 288, § 8, which is applicable only to penal actions strictly and properly so-called.

(3) *Statute of Limitations. Part Payment. New Promise.*

A committee appointed by the creditors of a corporation were allowed by the corporation to take the property and manage it as they saw fit for the benefit of the creditors ; the committee exercised absolute control over the property ; the directors took no part in the management of the business ; the creditors, out of the proceeds of the property, paid themselves three dividends :—

*Held,* that the committee were in effect assignees of the company, and hence, under the well-settled rule, the payments out of the assigned estate did not avoid the statute of limitations.

*Peabody* v. *Tenney,* 18 R. I. 498, explained and limited.

BILL IN EQUITY brought by Charles H. Warren and Edgar V. Salisbury, both of Providence, R. I., as surviving partners of the firm of Kilton, Warren & Company, formerly consisting of said Warren and Salisbury, and John B. Kilton, late of said Providence, deceased, against the Providence Tool Company and its several members and stockholders and their representatives to enforce the liability of such stockholders to pay the debts of said Providence Tool Company imposed by sections 1, 2, and 9 of the act in relation to manufacturing corporations, passed at the June session of the General Assembly, A. D. 1847, and the statutes in amendment thereof. Judgment having been obtained against the company February 20, 1892, and an execution issued thereon returned *"nulla bona."*

At the June session of the General Assembly, 1847, an act in relation to manufacturing corporations was passed, the first section of which is as follows :

"SECTION 1. The members of every manufacturing company that shall be hereafter incorporated shall be jointly and severally liable for all debts and contracts made and entered into by such company until the whole amount of the capital stock fixed and limited by the charter of said company or by vote of the company in pursuance of the charter, shall have been paid in and a certificate thereof shall have been made and recorded in a book kept for that purpose in the office of the city or town clerk of the city or town wherein the manufactory is established and no longer, except as hereinafter provided."

Section 9 of said act provides for the filing of an annual certificate, and in case of failure so to do : "All stockholders of said company shall be jointly and severally liable for all the debts of the company then existing, and for all that shall be contracted before such notice shall be given, unless such company shall have become insolvent and assigned its prop-

·erty in trust for the benefit of its creditors, in which case the obligation to give such notice by the filing of such certificate ,shall cease."

And section 20 of said act provides that : ' "The provisions ·contained in this act may be amended or repealed, at the pleasure of the General Assembly ; but such amendment ·or repeal shall not take away or impair any remedy, given .against any such corporation, its members or officers, or enlarge or extend the liability of such corporation, its members ·or officers, for any debt or liability *which shall have been incurred previous to such amendment or repeal.*" ·

The charter of the Providence Tool Company, passed at the same session of the General Assembly, provides :

"SEC. 6.   The liabilities of the members and officers of this corporation for the debts of the company shall be fixed and limited by, and the corporation, its members and officers, ,shall in all respects be subject to, the provisions of ' an act in relation to manufacturing corporations,' passed at the June .session of the General Assembly, A. D. 1847, in the same manner as if said company had been incorporated after said .act had gone into effect."

The provisions of the "act in relation to manufacturing ·corporations," passed at the June session, 1847, so far as they .affect this case, though specifically repealed by, were substantially re-enacted in, the revision of 1857, and again in the revision of 1872, becoming chapter 142 in the General Statutes, and so remained until April 20, 1876, when, by chapter .555, passed at the January session, 1876, chapter 142 of the General Statutes was amended by limiting the liability of a   . member of an incorporated manufacturing company, provided by sections 1 and 12 of said chapter 142 of the General Statutes and under other statutory provisions for the debts   · of such company thereafter contracted or for obligations there.after incurred, to the shares of such members in such corporation paid up to the par value thereof ; and, on failure to file the annual certificate, to an additional amount up to but not ·exceeding the said par value of his said shares.   This amendment became section 13 of chapter 155 of the Public Statutes

of 1882, and is now section 13 of chapter 180 of the General Laws.

For previous opinions in this case, see 19 R. I. 360 and 656. Heard on bill, answers, and proof, and bill dismissed.

DOUGLAS, J.   The complainants are judgment creditors of the Providence Tool Company, and, having issued an execution against said company, which has been returned "*nulla bona*," bring this bill, alleging that the defendants were stockholders of the tool company at the time when the complainants' debts were contracted ; that the company never made any return of its organization or any return of its standing, as required by its charter and the statute to which its charter is made subject; and that, therefore, the defendants are jointly and severally liable to satisfy the judgment against the company.

An analysis of the bill is given in the opinion rendered January 30, 1896, 19 R. I. 360, which overrules the demurrers filed by the several defendants and reserves the defences offered, holding that they may be set up by answer and determined on the final hearing of the bill.

Another opinion, December 12, 1896, 19 R. I. 656, was rendered, after hearing upon pleas of several defendants who, being executors or administrators of deceased stockholders, pleaded the special statute of limitations applicable to them, and sustained the pleas.

January 11, 1897, the bill was dismissed by consent as against Arthur Knight, Wilmarth H. Thurston, Cornelia R. Thurston, John R. Gladding, and John O. Thurston, and February 24, 1897, a decree was entered dismissing the bill as against Pallas S. Wheeler, Elizabeth G. King, and Elizabeth V. Andrews, upon the ground stated in the opinion of December 12, 1896.

The remaining defendants set up in their answers various defences. Amongst them the statutes of limitation are pleaded in various forms: First, as barring the present suit against the stockholders; and, secondly, as a defence which might

have been pleaded to the action of assumpsit wherein judgment was obtained against the corporation.

(1)  There was some contention, in the argument of the case, as to what statute the alleged liability of the defendants should be founded upon.

The charter granted at the June session, 1847, by its terms imposed upon the corporation and its stockholders the liabilities set forth in the general law applying to manufacturing corporations, passed at the same session but not taking effect till after adjournment.  The latter statute contains a provision that it may be amended from time to time, and it was amended before the contracting of the debts in question.  At that time the law upon the subject was contained in chapter 600 of the Public Laws, passed March 27, 1877, and the same provisions are now found in sections 1, 12, 13, and 22, of chapter 180 of the General Laws, 1896.

. We have no doubt that the new provisions apply to stockholders under this charter.  The language of Pub. Laws cap. 555, passed April 20, 1876, is : "The liability of a member of an incorporated manufacturing company provided by sections 1 and 12 of chapter 142 of the General Statutes, and of the members of such corporations *under other statutory provisions* for the debts of such company hereafter con-, tracted, or for obligations hereafter incurred, shall be and hereby is limited," etc.

Section 2 of chapter 600 of the Public Laws is identical with section 22 of chapter 180 of the General Laws, and reads as follows :

"SEC. 2.  All proceedings to enforce the liability of a stockholder for the debts of a corporation shall be either by suit in equity conducted according to the practice and course of equity, or by an action of debt upon the judgment obtained against said corporation; and in any such suit or action such stockholder may contest the validity of the claim upon which the judgment against such corporation was obtained upon any ground upon which such corporation could have contested the same in the action in which such judgment was recovered."

This section gives no action to the creditor against the stockholders until he has exhausted his remedy against the corporation. It was so argued in *Third National Bank* v. *Angell*, 18 R. I. 1, where the court say : "Presumably the plaintiff has, by his former suit, exhausted his remedies against the corporation or he would not be proceeding against the stockholders." And it was expressly so decided in *Allen* v. *Arnold*, 18 R. I. 809. The second clause of the section clearly implies that the judgment against the corporation shall precede the action or suit against the stockholders.

It is argued by some of the defendants that the liability of the stockholder, at least under section 1, is primary and absolute from the time of contracting the debt, and that, therefore, the statute of limitations begins to run in his favor immediately. Such would doubtless be the case if an action against him were given immediately, as in some of the cases cited by counsel. In *Stilphen* v. *Ware*, 45 Cal. 110, the statute in force (Stats. 1850, cap. 127, § 30) provided : "The preceding sections of this act shall not affect actions against directors or stockholders of a corporation to recover a penalty or forfeiture imposed or to enforce a liability created by law, but such actions must be brought within three years after the discovery by the aggrieved party of the facts upon which the penalty or forfeiture attached or the liability was created." It is further provided : "Stat. 1850, cap. 128, § 32. Each stockholder of any corporation shall be individually and personally liable for a portion of all its debts and liabilities proportioned to the amount of stock owned by him."

The case held that in a suit upon a debt due from a corporation the liability of the stockholder "was created" when the debt became due.

*Hardman* v. *Sage*, 124 N. Y. 25, holds that where the statute made stockholders liable only for such corporation debts as were payable within one year from the time they were contracted, the extension of the time of payment beyond a year released the stockholders from liability.

*Bassett* v. *Hotel Co.*, 47 Vt. 313, was a bill in equity against

a corporation and its officers, not to enforce the liability of a stockholder.

*Sullivan* v. *Sullivan Mfg. Co.*, 20 S. C. 79, was an action against the officers of a corporation who had failed to make returns.   The case is not in point, but the court say, amongst other things, p. 90, "The consideration of the plea of the statute of limitation comes next.   When the statute is applicable at all, it commences to run at the accrual of the right of action."

The liability attaches to the stockholder when the debt is incurred, but no statute of limitation begins to run in his favor until a right of action against him is acquired by the creditor.   *Bank of U. S.* v. *Dallas*, 4 Dana, 574; *Hawkins* v. *Furnace Co.*, 40 O. St. 507; *Bronson* v. *Schneider*, 49 O. St. 438; *Handy* v. *Draper*, 89 N. Y. 334; *Powell* v. *Oregonian Ry. Co.*, 38 Fed. Rep. 187; *Longley* v. *Little*, 26 Me. 162; 1 Cook on Stock, etc., §§ 195, 225, (f).   The debt might be in the form of a note or bond, payable more than six years after its date, and it would be absurd to hold in such a case that the statute of limitations begins to run when the liability begins.   Chapter 600 did not, indeed, alter the obligation of the stockholder to pay the existing debts of the corporation, but it did very materially alter the remedy, and, amongst other things, postponed the creditor's right of action until he should have failed to obtain satisfaction from the corporation.   The words "primary and direct" contrasted with "secondary," when spoken of an obligation, refer to the remedy provided by law for enforcing the obligation rather than to the character and limits of the obligation itself.

When Judge Durfee, in *Moies* v. *Sprague*, 9 R. I. 541, said the obligation was primary and direct, the law gave the creditor the right to sue the stockholder simultaneously with the corporation.   The remedy was direct and immediate, and hence the obligation was properly called primary.   When the remedy was changed, while the stockholders remained liable for the same debts in the same amount and for the same omissions as before, the court might well say, as *In re Penni-*

*man,* 11 R. I. 333, that the essential character of the obligation had not been changed; though, since the recourse of the creditor to the stockholder had been limited to a circuitous proceeding instead of a direct one, the obligation with respect to the remedy could no longer be called primary and direct.

The statutes of limitation likewise affect remedies not obligations.

The creditor under our statute cannot bring debt on judgment until he has obtained the judgment; and when his right of action accrues, the statute of limitations begins to run against him.

(2)    It is argued, again, that the liability imposed by the provisions of the law is penal, and, hence, that the action or suit brought against the stockholder must be begun within one year from the time it accrues.    But the statute of limitations which these defendants refer to has no application to civil actions, strictly so-called.    Section 8 of chapter 288, which is referred to, is as follows:

"All suits or prosecutions founded upon any penal statute which are wholly or in part for the use of the prosecutor, shall be brought within one year, and all other suits and prosecutions on such statute within two years after the commission of the offence, unless otherwise provided."

A glance at the chapter in which these words appear will show that they refer to the recovery, by action of debt, of fixed pecuniary penalties which the statutes have imposed for misdemeanors or violations of the public law.    The chapter is entitled, "Of fines, penalties, and forfeitures."    Section 2 provides:

"All complaints and warrants, indictments, actions, and informations founded on any penal statute shall be brought within the county in which the offence was committed."
Section 3:

"Unless otherwise specially provided for, all fines recovered shall be to the use of the state; and all penalties and pecuniary forfeitures, one-half thereof to the use of the state and one-half thereof to the use of the person who shall sue for

the same; all forfeitures of personal property shall be disposed of as by law shall be provided;" and section 4:

"All fines, penalties, and forfeitures, whether of money or property, of twenty dollars or under, shall be prosecuted before a district court; if upwards of twenty dollars in amount or value, before the common pleas division of the supreme court, unless otherwise specially provided."

The provisions of this chapter have no application to the recovery of the penalty of a bond or to any money claim, whether arising from agreement or tort, by promise or by operation of law, lying in the domain of private right and not affecting the course of public justice.

Penal statutes, in the meaning of this chapter, are statutes imposing penalties for some violation of public right.

That the effect of this statute is to impose a penalty upon the stockholder for the default of the corporation may be admitted.   *Sayles* v. *Bates*, 15 R. I. 342; *Wing* v. *Slater*, 19 R. I. 597; *Hancock National Bank* v. *Farnum*, 20 R. I. 466. But this does not bring it within the meaning of the words "penal statutes," as used in chapter 288.   The statute referred to in *Merchants Bank* v. *Bliss*, 35 N. Y. 412, fixed at six years the limitation of time within which "an action upon a liability created by statute other than a penalty or forfeiture" might be commenced, and three years as the limit within which "an action upon a statute for a penalty or forfeiture where action is given to the party aggrieved" might be commenced.   The court held that the action before them, which was against trustees of a corporation for not rendering returns, was to recover a penalty given by statute, and the latter statute of limitation applied.

The Supreme Court Commission of Ohio arrived at exactly the opposite conclusion in regard to the statute of that State, which was in the same words.   *Hawkins* v. *Furnace Co.*, 40 O. St. 507.

In *Patterson* v. *Thompson*, 86 Fed. Rep. 85, the statute of limitations of Oregon is not given.   But we infer from the argument of the court that it resembles the New York statute rather than our own.   The case was also against the

directors of a corporation, for declaring dividends when the corporation was insolvent.

In *Attrill* v. *Huntington*, 70 Md. 191, the court refused to enforce a statute of the State of New York, providing that corporation officers who make false returns shall be liable to pay the debts of the company, on the ground that the statute was penal. The dissenting opinion of Stone, J., discriminates between statutes which impose penalties by way of compensation to private individuals and criminal statutes imposing penalties to be recovered on behalf of the State, but which may be shared, when recovered, between the State and the informer. The former statutes, he shows, may be enforced in a foreign jurisdiction, while the latter cannot.

The Supreme Court of the United States, where this case was taken on writ of error, reversed the decision of the court and approved the minority opinion, 146 U. S. 657. Mr. Justice Gray, in delivering the opinion of the court, says, p. 666: "In order to determine this question it will be necessary, in the first place, to consider the true scope of the fundamental maxim of international law stated by Chief Justice Marshall in the fewest possible words. 'The courts of no country execute the penal laws of another.' *The Antelope*, 10 Wheat. 66, 123. In interpreting this maxim there is danger of being misled by the different shades of meaning allowed to the word penal in our language.

"In the municipal law of England and America the word 'penal' and 'penalty' have been used in various senses. Strictly and primarily they denote punishment, whether corporal or pecuniary, imposed and enforced by the state for a crime or offence against its laws. *United States* v. *Reisinger*, 128 U. S. 398, 402 ; *United States* v. *Chouteau*, 102 U. S. 611. But they are also commonly used as including any extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged, not limited to the damages suffered. They are so elastic in meaning as even to be familiarly applied to cases of private contracts wholly independent of statutes, as when we speak of the 'penal sum' or 'penalty' of a bond. In the words of Chief Justice Marshall : 'In general

a sum of money in gross to be paid for the non-performance of an agreement is considered as a penalty, the legal operation of which is to cover the damages which the party, in whose favor the stipulation is made, may have sustained from the breach of contract by the opposite party.' *Tayloe* v. *Sandiford*, 7 Wheat. 13, 17.

" Penal laws strictly and properly are those imposing punishment for an offence committed against the State, and which by the English and American constitutions the executive of the State has the power to pardon.  Statutes giving a private action against a wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal."

The statute of limitations we are considering is very clearly applicable only to penal actions strictly and properly so-called, and does not affect the present action.  The statute here applicable is that which allows twenty years for bringing an action of debt on a specialty.  Gen. Laws cap. 234, § 4 ; *Atwood* v. *Agricultural Bank*, 1 R. I. 376.

 It need hardly be said that this construction of chapter 288 is not a decision that the provisions of chapter 555, Public Laws, imposing special liabilities upon stockholders and officers of manufacturing corporations, in cases of non-performance of statutory duties, are not of a penal character. ) *Chase* v. *Curtis*, 113 U. S. 452 ; *Park Bank* v. *Remsen*, 158 U. S. 337, and Rhode Island cases cited above.

(3)     From what we have said above, it follows that the defendants cannot rely upon any statute of limitations to bar the present suit, unless it is one upon which the corporation could have contested the suit against itself.  The statute, however, permits the defendants to plead, as all of them have done, the statute of limitations as a defence which the corporation might have set up in the suit against it, and we are called upon to consider whether this defence, if it had been pleaded in that action, should have prevailed.

The claim sued upon consisted of a book-account for goods sold and delivered, and nine promissory notes, the last of which

became due July 14, 1882.    Upon these notes and this account payments were made August 18, 1882, February 9, 1885, and December 5, 1885.    The complainants contend that these payments constituted new promises, and the last one having been made within less than six years before the commencement of the suit, November 17, 1891, takes the case out of the statute.

The defendants contend that the circumstances in which these payments were made preclude any inference of a new promise.

The question came before the court in *Peabody* v. *Tenney*, 18 R. I. 498, and it was there decided that these payments were made by the corporation and were effectual to take the claims out of the statute.

The case was heard upon bill and answer.    No evidence was taken.    The answers admitted that the payments were made by the corporation, but claimed that, inasmuch as the corporation was compelled by circumstances to allow the creditors' committee to make these dividends, it made them under duress and not voluntarily.    This was the only point considered by the court, no contention being made that the payments were in any other way restricted.    The decision was inevitable that the circumstances set up did not constitute duress, but that the payments were voluntary.    Such payments are *prima facie* ground for inferring new promises, and, in the absence of other proof, the court gave the payments that effect.

There is nothing in that case to preclude a re-examination of the transaction in the present proceeding between different parties and with all the attainable facts in evidence.

April 19, 1882, the president of the company issued an invitation to the creditors to meet on the 22d of that month "for the purpose of hearing the statements to be made by the company and taking action upon the present condition of affairs."    At the meeting a full statement was submitted to the creditors, and they unanimously appointed a committee to investigate and send a copy of their report to every creditor, and assumed to give the committee "power in their discretion to make use of and employ any of the funds and

assets of the company, for the purpose of finishing any of the manufactures of the company in process, to make such products of more value, and to permit them to be sold for the benefit of the company."

The committee issued a report, May 20, giving the creditors a detailed statement of the affairs of the company and recommending the selection of three trustees and the conveyance of the property to them, with the view of selling part of the property, not needed in the business, and paying the proceeds of sales and profits of the business on the debts of the company. A meeting of the creditors was held May 26, at which the creditors voted to adopt the recommendation of the committee, and, in the meanwhile, the record of the meeting says: "The original creditors' committee was requested to operate the works in their discretion until the trustees shall have been appointed and the papers executed."

On the 21st of August, 1882, the company, through its president, issued another circular to the creditors, in which it is said: "The company regrets to announce that it is now powerless, as, while its first object has been to pay its debts in full, the obstructive course taken by some of its creditors makes this impossible, and makes an assignment unavoidable as well. Immediately upon its failure, the company put the control of its affairs without reserve into the hands of a committee of creditors, and, moreover, offered the earnest services of its officers in aid of a prompt settlement. . . . This sale (of the sewing-machine property) has finally been effected after much delay and under so many difficulties and humiliating negotiations that the company is utterly discouraged from further attempting a settlement of its affairs. We understand the creditors' committee also declines to do anything more. The two committees were chosen by the creditors without opposition, and in full meetings, without a nomination or the slightest suggestion on the part of the company as to its desire in the matter. The company, without hindrance of any kind, has endeavored to further the objects of the committee," &c.

December 12, 1882, the following was issued:

"COMPANY'S CIRCULAR.

"*To the creditors of the Providence Tool Company:*

"Our last circular was dated May 21 last. Following this the committee called a meeting of creditors, which was held in Providence on the 29th of August, and was largely attended. At this time the committee of eleven made a report announcing that the object for which it was appointed (viz. : the choice of trustees and the conveyance of the company's property to persons so chosen for the benefit of all creditors) could not be accomplished. The resignation of the committee has accordingly been accepted.

"The first committee of five was requested to continue in charge of the property and business of the company. . . .

"The officers of the company have, reported to the committee all their doings, submitted separate statements of its business and accounts, and sought the committee's advice in all matters.

"It is earnestly hoped that some means will speedily be found both to dispose of the property of the company and to divide the proceeds among its creditors.

"Respectfully submitted,

"In behalf of the company,

"JOHN B. ANTHONY, *President.*

"PROVIDENCE, R. I., December 12, 1882."

The evidence corroborates the statement of these circulars as to the relation of the committee of creditors to the corporation. The committee appointed by the creditors were allowed by the corporation to take the property and manage it as they saw fit, or as the general body of creditors directed, with the object at first of selling off surplus property and running the remainder in the hope of paying the debts in full ; but it is clear that as early as August, 1882, all parties had abandoned any hope of doing more than turning the property into money and dividing the proceeds among the creditors. For this purpose the committee continued to exercise absolute control over the property of the company and

its business, using its officers to carry out their plans. The stockholders held no meetings until November 27, 1891, when they assembled to vote to make a general assignment to the survivor of the creditors' committee. The manufactory was shut down before the appointment of the committee, and was only run afterwards under their control. The directors of the corporation ceased to meet, and took no part in the management of the business. The creditors, by their committee, took actual possession and control of all the property of the company and out of the proceeds of the property paid themselves three dividends, amounting in all to fifty per cent. of the indebtedness. It is the payments of these dividends— August 15, 1882, February 9, 1885, and December 5, 1885— that the plaintiffs rely upon as grounds for inferring a new promise by the company.

It may not be easy to define the exact legal status of this committee with reference to the corporation and the creditors. It is very plain that in fact they assumed the place and performed the duties which assignees have and perform in winding up the affairs of an insolvent debtor. After July, 1882, when the plan for a three years' extension and a conveyance of the property to trustees was abandoned (see circular), there was no hope or expectation that anything else could be accomplished than to make the most of the assets for the benefit of the creditors, and the committee were left in charge to do this. In the scope of this employment they managed the business, sold the property, and divided out the proceeds amongst the creditors who had appointed them. We do not see how the creditors who appointed them, who directed their action, and who shared in the dividends, can question their title or say that they were not assignees of the company *de jure* as well as *de facto* ; but if we fall back upon the proposition that in what the committee did with the assets of the corporation by its sufferance they were in law the agents of the corporation, we must still limit their agency by reference to the object of their appointment, which was to do these acts, as assignees, for the purpose only of disposing of the assets and dividing them amongst the creditors ; and so we

do not think that we can give to their acts, under this limited agency, any different construction than the law attaches to similar acts when performed by an assignee duly constituted. It is not enough that the agent is authorized to make the payment; his authority must bind the principal by a promise to pay, and such authority cannot be implied from the bare authority to make a payment. *Winchell* v. *Hicks*, 18 N. Y. 558; *Brown* v. *Latham.* 58 N. H. 30, 35.

The agreement that they should act virtually as assignees was proposed by the creditors, assented to by the president of the company in its behalf, ratified by the silence of the directors and stockholders, and made binding on all parties by acts performed.

A fair deduction from the conduct of the parties is that the acts which the committee performed in the capacity of assignees should be given the same force and credit as if the legal title to the property had been conveyed to them in trust for the benefit of the creditors, but we do not think that the law requires us to give to their acts an interpretation which is not necessarily implied from the nature of their employment.

It is well settled that payments to a creditor by an assignee out of an assigned estate do not avoid the statute. 1 Wood on Lim., p. 278, § 99; p. 281, § 101; *Roosevelt* v. *Marks*, 6 Johns. Ch. 266; *Pickett* v. *Leonard*, 34 N. Y. 175; *Pickett* v. *King*, 34 Barb. 193, overruling *Barger* v. *Durvin*, 22 Barb. 68; *Davies* v. *Edwards*, 7 Exch. 22; *Read* v. *Johnson*, 1 R. I. 81; *Marienthal* v. *Mosler*, 16 O. St. 566; *Roscoe* v. *Hale*, 7 Gray, 274; *Stoddard* v. *Doane*, 7 Gray, 387; *Richardson* v. *Thomas*, 13 Gray, 381; *Hidden* v. *Cozzens*, 2 R. I. 401; 2 Smith Lead. Cas. 9 ed. 913.

Again, the corporation is entitled to have these payments interpreted in connection with the declarations of the president to the creditors when he, on behalf of the company, turned over the business and assets to them. If, in making this transfer of control, he acted as agent of the company, and this act was ratified by the company's silent acquiescence, his declarations on the company's behalf were its declarations also. It must be remembered that the payments were not made by any vote

of the directors or of the corporation, but by direction of the committee after the president had put them in control and submitted the corporation officers to their orders. If the silence of the corporation ratified the payments, it ratified them only coupled with the president's declarations.

It was early declared by this court that a partial payment is only *prima facie* ground for inferring a new promise. It is said by Chief Justice Job Durfee in *Read* v. *Johnson,* 1 R. I. 81, 82, decided in 1838 : "Since the recent decisions have given a new aspect to the statute of limitations, nothing but an express promise or that from which an express promise can be clearly inferred will take a demand out of its provisions. And in coming to a determination in a case like this, courts are governed by what appears to be the manifest intent and meaning of the party rather than by a meaning artificially forced from his words and acts, or which, by a constrained construction, may be supposed to be implied therein." Judge Haile, in *Shaw* v. *Newell,* decided in 1852, 2 R. I. 264, p. 267, says : "An acknowledgment to take a debt out of the operation of the statute must be an unqualified acknowledgment of a then-existing debt, for if the acknowledgment be accompanied by any qualification which shows that the defendant intends to rely on the statute or does not intend to pay, or will rebut the presumption of a promise to pay, it will not be sufficient." In *Hidden* v. *Cozzens,* decided in 1853, 2 R. I. 401, the court say : "Where the creditor does not rely upon an express promise, but upon a promise to be raised by implication from the acknowledgment of the party debtor, we think such acknowledgment ought to contain an unqualified and direct admission of a previous subsisting debt, which he is liable and willing to pay. If there be accompanying circumstances which repel the presumption of a promise or intention to pay, the admission is of no avail. If the acknowledgment be accompanied by the declaration of the debtor that he is unwilling or unable to pay the debt, the declaration neutralizes the effect of the acknowledgment," citing *Bell* v. *Morrison,* 1 Pet. 362 ; *Hancock* v. *Bliss,* 7 Wend. 267.

It is said in Wood on Limitations, section 104: "The principle upon which a part payment of principal or interest by a debtor will prevent his availing himself of the bar of the statute is that such a payment amounts to an acknowl-edgment of the debt, and from an absolute acknowledgment, as we have seen, the law implies a new promise founded in an old consideration to pay," citing, among other cases, *Turner* v. *Ross*, 1 R. I. 88:

And in section 105, page 289: "The rule is that a partial payment on a debt, whether of principal or interest, is *prima facie* evidence of an acknowledgment that the residue is unpaid, and suspends the running of the statute from that date, and such payment may be proved by parol. It follows, therefore that the implication of a promise derived from part payment of principal or interest is liable to be rebutted, and it will not take the case out of the statute unless under cir-cumstances which do not negative the implied promise to pay the residue." See, also, 2 Smith's Lead. Cas., 9th Am. Ed. ·909.

Now, nothing could be plainer than the declarations in the ·circular of August 21, 1882, which, according to the evidence, was sent to every creditor. It notified them, in substance, that every effort had been made so to continue the business as to pay the debts in full; that these efforts had been frus-trated, and the company had turned over all its assets and had given the services of its officers into the hands of the committee for the purpose of turning all its property into money and dividing the proceeds amongst its creditors. It promised, in effect, to allow the committee to pay out the assets, but notified the creditors that beyond this the com-pany could do nothing.

Such expressions as these: "The company, however, regrets to announce that it is now powerless, as, while its first object has been to pay its debts in full, the obstructive course taken by some of its creditors makes this impossible," and "The company is utterly discouraged from further at-tempting a settlement of its affairs," and "We believed our property to be ample to pay all debts; we offered our best

services in accomplishing such a result, but we have been prevented from doing this," &c., and "This statement is made in the hope that the large body of creditors will understand that the company has done its utmost to obtain the best results from its property and to pay all proper claims in full," and, finally, "The up-town factory is now running, under the authority of the committee, for the purpose of completing some unfinished work, but it will be again stopped within a few days, and what remains of a business built up by thirty years' labor will be lost," are equivalent to saying, what was obvious to all the creditors as the simple truth, that the corporation could not pay any balance that might remain of its debts after the property then in the control of the creditors' committee should have been distributed. And the payments which were made afterwards from that fund were received by the creditors with this notice that the corporation undertook to do nothing further.

In the light of these declarations, we do not see how it is possible to infer a new promise from these payments. Such could not have been, in the words of Chief Justice Job Durfee, "the intent and meaning of the party." As was said in *Phelps* v. *Stewart*, 12 Vt. 256, "We are not at libberty, therefore, when all the declarations are considered, to raise an implied promise in direct opposition to the party's declared intention."

So it was held in *Manning* v. *Wheeler*, 13 N. H. 486 : That an admission that a party owes a debt with an assertion that he is unable to pay it, is insufficient to take a case out of the operation of the statute of limitations.

Having reached this conclusion, we need not discuss the further defences raised by different defendants. As the debts on which the bill is brought are barred by the statute of limitations, the bill must be dismissed.

*Tillinghast & Tillinghast*, for complainants.

*Herbert Almy, Alexander L. Churchill, A. S. Miller, J. M. Ripley, John Henshaw, Cooke & Angell, Bassett & Mitchell, Edwards & Angell, J. D. Thurston, W. W. & E. W. Blodgett, and John A. Tillinghast*, for respective respondents.