Ho WRY, J.,
delivered the opinion of the court:
The findings show that the Sally, Villett, master, sailed from Newport, It. I., bound for Africa, where a cargo of slaves was purchased. While on the return voyage with the slaves to the neutral island of St. Thomas and from there to Georgia (pursuant to orders received from the owners of the vessel before sailing from this country) the brig was captured by a French privateer and taken to Guadaloupe, where *82 the brig and everything- belonging to her was condemned as good prize. The reasons alleged for condemnation were that the brig was coming from the'coast of Africa with a cargo of blacks and was taken within 2 leagues to windward of Antigua. The prize tribunal decreed condemnation in pursuance of a resolution of the agents of the executive directory. The questions in this case are whether the United States had a valid diplomatic claim against France, and did this Government assume to pay the claim under the act of January 20, 1885 (23 Stat. L., 283).
At the time of the capture the slave trade was lawful, not only in this country, but by the law of nations, according to the Supreme Court (10 Wheat., 06). That is, when the ship sailed it was lawful to bring slaves to our own shores, but not lawful by our domestic statutes to transport inhabitants of a foreign country to another foreign country for the purpose of selling or disposing of them as slaves. It was not until 1808 that the general prohibition against domestic importation became operative. The State of Georgia was eight years in advance of the United States in that respect, for within a very short time after this adventure Georgia adopted a constitution which prohibited the future importation of slaves from Africa or any foreign place after October 1, 1798. (Sec. 11, Art. IY, Cons, of Ga., May 30, 1798. Poore’s Compilation of Constitutions.) Colonial Rhode Island was sixteen years in advance of Georgia with respect to the gradual abolition'of slavery.' (10 R. I., Col. Rec., 7.)
The grounds assigned by the decree of the prize tribunal which condemned the vessel are clear enough in language. But what was meant by the resolution of the agents of the French Directory, unless it be that no neutral coming from the coast of Africa with a cargo of blacks had a right to be within 2 leagues to windward of Antigua,, we do not know. This resolution could not make unlawful the act of a neutral engaged in commerce lawfully authorized by the country from whence the neutral sailed. The ship was, therefore, unlawfully seized and condemned, and a valid diplomatic claim against the seizing government arose in behalf of the citizen of the country to which the vessel belonged, unless treaty rights could not be claimed for the vessel, this capture *83 being before tlie abrogation of the treaty between France and the United States.
But an act passed by the colonial assembly of Rhode Island provided that no citizen or resident therein should receive on his vessel, with intent to cause to be imported or transported from their native country, any inhabitants in that part of the world called Africa as slaves without their voluntary consent. (10 R. I., Col. Rec., 262.) The act was passed in 1784. But Rhode Island, by adopting the Constitution of the United States in 1792, surrendered the privilege of regulating foreign commerce. Congress alone were invested with that power. (Art. I, sec. 6, Cons. U. S.)
The vital question arises under an act (1 Stat. L., 347) approved March 22, 1794, by which Congress prohibited the importation of the inhabitants of any foreign kingdom, place, or country to another port in a foreign country for the - purpose of selling or disposing of such inhabitants as slaves.
What, then, was the purpose of the parties? The intent is the essence of the controversy, and by this intent the act must be governed in the absence of any effort to sell or dispose of the cargo. Was it the purpose of the owners to send or the intent of the agents of the owners to go to a foreign country to procure and transport any of the inhabitants of that country to another foreign country to sell or dispose of such a cargo as slaves, or was it the design to bring this cargo to the domestic port of Savannah, Ga. ?
Rejecting as inadmissible the testimony offered by claimants to show the special reason for attempting to put into St. Thomas, we pause long enough in this connection to say that if there is any proposition better established than another in connection with spoliation cases under the act of our jurisdiction it is that which excludes from consideration memorials, affidavits, and ex parte statements made by the shipowners of those days, and others in their behalf, long after the occurrences to which they are supposed to relate. (The ship Parkman, 35 C. Cls., 406; The Hiram, Whitney, 41 ibid., 12.)
The competent evidence offered does establish, however, that the return voyage of this ship was to St. Thomas and from thence to Georgia, pursuant to orders. Out of this *84 alone we are unable to make the act of the parties an’ unlawful act. The home port was Savannah, Ga. That was the place of ultimate destination. It was lawful to make it so by the owners, and it was unlawful to order a stop on the way in the port of any foreign country for the purpose of doing that which might lawfully be done at home. The lawful character of the act under such orders must be presumed. The unlawful character can not be inferred, but must be proved. • The statute, being highly penal in its terms, must be strictly construed. The courts can not search for an intention not suggested by the language of'the orders and the conduct of the master under them.
It is not reasonable to believe that the purpose existed on the part of this shipowner when the sailing orders were given, or on the part of the shipmaster when he attempted to execute them, to carry these persons from the Gold Coast to foreign territory and there endeavor to sell them as slaves, because it appears that the market was wanting at the time in this ^foreign country. France, in following the doctrines of her Revolution, had abolished colonial slavery in 1193, and though Napoleon attempted to undo the work of the convention, slavery for a time did not exist by law. From 1794 until the Consulate preceding the First Empire the institution did not lawfully obtain in the possessions of the French. Its sickly existence in the West Indies about the time of this seizure forbids the belief that attempts to land and sell savage blacks would have met with success. Though slavery did exist in a small way in St. Thomas until a later period, the island itself ivas neutral at the time of the seizure of this vessel. If anybody understood 'the conditions and hazards surrounding such an attempt to sell slaves there, this shipmaster and the owners undoubtedly did.
The recitals of the decree confirm the want of market opportunity in the foreign pjort. When the authorities took possession of the cargo the captives were not sold, but put to work on the national plantations.
There is a final view to be noted which strengthens the conclusion that the vessel was not violating the prohibitive act under consideration. The statutory bond given before the clearance of the vessel for the lawfulness of the voj^age *85 was subsequently canceled at the Treasury. The officials charged with that duty must have been satisfied that the obligation of the bond had not been infringed.
Reluctant as the court is to deal with this ancient demand, not merely because of the nature of the ship’s employment, but because of the doubts suggested as to the intent of the master in making for St. Thomas, there is nothing to do but to give effect to the will of Congress. For the discharge of its duty the court does not need to be reminded of the words of Chief Justice Marshall, who, speaking for the Supreme Court in a case where the right of a foreign vessel engaged in the slave trade was asserted as against an American cruiser, said that the court must not yield to feelings, but must obey the mandate of the law. (The Antelope, 10 Wheat., 114.) Still less does the court need for the performance of its duty the argument of counsel that the question of the moral nature of the business of shipping-slaves at the time of this capture has no proper place in the determination of the rights of the’ parties. True, this argument emphasizes the respectability of the traffic at the time (Rhode Island alone having. 150 vessels engaged in it in 1770) ; that the trade in human species was the first wheel of commerce in Newport; that the town was built up and flourished by that trade (Spear’s American Slave Trade, Scribner, 1900, p. 19), and that if prospective purchasers could be found in Georgia for savage labor, Rhode Island shipowners were willing to violate public sentiment there and go with rum and tobacco to barter with some savage king for his subjects, to be transported where such labor could be profitably employed. The doubt has arisen as to the meaning of the sailing orders and the purpose of the master in making for the foreign^ port. There is a case where the original design and purpose of the voyage have been veiled by the pretense of the owner as well as the ship-master (the Ameclie, 1 Acton, 240), and likewise a case where, on account of the alleged tumultuous disposition of the slaves, the master altered his course to a more convenient port (the Nancy, 2 Acton, 4), and likewise a case where the vessel had touched the settlements of European nations and in attempting to make for a foreign port was *86 captured (the Ann, 2 Acton, 6). But these cases were examined in the Antelope, ante, and it was held that one nation would not execute the penal laws of another. It will be found upon further examination that these cases have no application beyond the real purpose which took the vessels to foreign ports, and we must turn at last to the objects in view when this ship was ordered to a foreign country to bring slaves back to our own.
There is no claim for the cargo, but the waiver does not include freight earnings. These are allowable on merchandise attempted to be brought from Africa to Savannah, Ga. Passenger rates can not be claimed for a cargo of slaves, but rates strictly for merchandise can be claimed as of the time. Freight earnings on this theory are as much a lawful claim tinder the act of our jurisdiction as the value of the vessel.
The minority of the court! is of opinion that as claimants have waived compensation for the cargo the waiver extends to freight earnings, as the vessel and cargo were owned by the same parties.
The findings of the court will be reported to Congress, together with a copy of this opinion.
Barney, J., dissents.